John M. DEWEY, et al., Plaintiffs,

v.

**VOLKSWAGEN OF AMERICA, et al., Defendants.**

Jacqueline Delguercio, et al., Plaintiffs,

v.

**Volkswagen of America, et al., Defendants.**

Civil Action Nos. 07–2249(FSH), 07–2361(FSH).

United States District Court, D. New Jersey.

July 30, 2010.

1. *Van De Berg v. C.I.R.,* 175 Fed.Appx. 539, 541 (3d Cir.2006).

Adam M. Slater, Matthew Ross Mendelsohn, Mazie Slater Katz & Freeman, Roseland, NJ, Dina Marie Mastellone, Genova, Burns & Giantomasi, Newark, NJ, Samuel P. Sporn, Jay P. Saltzman, Schoengold & Sporn, PC, New York, NY, for Plaintiffs.

Jeffrey L. Chase, Peter J. Kurshan, Chase, Kurshan, Herzfeld & Rubin, LLC, Livingston, NJ, Keith Andrew Frederick, Herzfeld & Rubin PC, New York, NY, Forrest Scott Turkish, Bayonne, NJ, Stephen Tsai, Stephen Tsai Law Offices, Bridgewater, NJ, for Defendants.

Pamela E. Kulsrud Corey, Pound Ridge, NY, pro se.

## OPINION

### FOR PUBLICATION [1]

SHWARTZ, United States Magistrate Judge.

### I. INTRODUCTION

This matter is before the Court by way of Plaintiffs' motions for: (1) certification of the settlement class; (2) final approval of the class settlement embodied in the agreement dated February 11, 2010; (3)

---

1. The Court has published this Opinion due to the size of the class and number of objections.

an award of attorneys' fees; and (4) reimbursement of expenses and costs. For the reasons set forth in this opinion, the motions are granted.

## II. BACKGROUND AND RELEVANT FACTS

The plaintiffs initiated two class actions against Defendants Volkswagen of America, Inc., Volkswagen AG, Volkswagen BG, and Volkswagen Group of America ("VWGoA") (collectively "VW") and Audi AG and Audi of America, LLC (collectively "Audi")[2] for alleged defects in certain cars. On May 11, 2007, Plaintiffs John M. Dewey, Patrick DeMartino, and Patricia Romeo (the "Dewey plaintiffs") filed a class action Complaint alleging that certain VW and Audi vehicles have defectively designed pollen filter gasket areas and sunroof drains. (Dewey v. Volkswagen of Am., Inc., Civ. No. 07–2249, Docket Entry No. 1 ¶ 1 (D.N.J. filed May 11, 2007).)[3] One week later, Plaintiff Jacqueline Delguercio ("Delguercio") initiated a substantially similar class action. (Delguercio v. Volkswagen of Am., Inc., Civ. No. 07–2361, Docket Entry No. 1 ¶ 1 (D.N.J. filed May 18, 2007).)[4] On June 22, 2007, the Court consolidated the cases for pre-trial purposes. (Dewey, Docket Entry No. 8; Delguercio, Docket Entry No. 6.)

According to their Fourth Amended Complaints,[5] the plaintiffs allege that design defects in the sunroof drain, the pollen filter, the plenum drains, and other parts of VW and Audi vehicles caused water to pool and spill over, rather than drain, damaging the interior cabin, transmission, and/or electrical systems of the car. (Dewey, Docket Entry Nos. 86 ¶ 3 and 87 ¶ 8; Delguercio, Docket Entry No. 63 ¶ 8.) Based on these allegations, the Dewey plaintiffs assert claims based on the New Jersey Consumer Fraud Act (CFA), the Uniform Commercial Code (UCC), common law fraud, negligent misrepresentation, breach of the duty of good faith and fair dealing, and unjust enrichment. (Dewey, Docket Entry No. 86 ¶¶ 70–121.) Based upon the same allegations, the Delguercio plaintiffs allege that the defendants breached express and implied warranties, improperly repaired the vehicles, breached the covenant of good faith and fair dealing, made negligent misrepresentations, violated the CFA, were unjustly enriched, and engaged in fraud. (Dewey, Docket Entry No. 871 ¶¶ 46–97; Delguercio, Docket Entry No. 63 ¶¶ 46–97.)

The defendants filed motions to dismiss and quash service upon the foreign defendants, (Dewey, Docket Entry Nos. 13, 24, 29, 41, 84; Delguercio, Docket Entry Nos. 16, 18), and the plaintiffs sought the issuance of letters rogatory and withdrew the same. (Dewey, Docket Entry Nos. 104, 108, 109, 110; Delguercio, Docket Entry No. 79.) The motions were denied with respect to all defendants except for Volkswagen de Mexico. (Dewey, Docket Entry No. 55.)

---

**2.** The claims against Volkswagen de Mexico were dismissed without opposition on November 19, 2008. (Dewey v. Volkswagen of Am., Inc., Civ. No. 07–2249, Docket Entry No. 116.)

**3.** Hereinafter, all record cites to Dewey v. Volkswagen of Am., Inc. will be formatted as follows: (Dewey, Docket Entry No. ____.).

**4.** Hereinafter, all record cites to Delguercio v. Volkswagen of Am., Inc. will be formatted as follows: (Delguercio, Docket Entry No. ____.).

**5.** The Dewey plaintiffs filed Amended Complaints on September 28, 2007, April 15, 2008, June 17, 2008, and July 30, 2008. (Dewey, Docket Entry Nos. 18, 57, 83, 86.) The Delguercio plaintiffs filed Amended Complaints on September 28, 2007, April 9, 2008, June 17, 2008, and July 30, 2008. (Delguercio, Docket Entry Nos. 11, 38, 60, 63; Dewey, Docket Entry Nos. 58, 87.)

The parties also engaged in discovery and raised numerous discovery and case management disputes. (*Dewey*, Docket Entry Nos. 43, 46, 49, 53, 60, 61, 72, 73, 78, 79, 80, 82, 91, 96, 98, 99, 101, 102, 111, 115, 118, 119, 120, 124, 133, 134, 137, 140, 143, 146, 147, 149, 152; *Delguercio*, Docket Entry Nos. 26, 29, 30, 32, 33, 41, 42, 47, 52, 53, 56, 58, 59, 61, 67, 68, 70, 71, 73, 75, 79, 81, 83, 84, 85, 88, 91, 97, 98, 100, 101, 102, 105, 106, 107, 108, 110.) Discovery included the production of thousands of documents, some of which were in foreign languages, more than fifty depositions throughout the United States, and consultation with numerous automotive experts. (*Dewey*, Docket Entry No. 163 Attach. 13 ¶ 3; *Delguercio*, Docket Entry No. 121 Attach. 13 ¶ 3; *Dewey*, Docket Entry No. 163 Attach. 2 ¶¶ 16–18; *Delguercio*, Docket Entry No. 121 Attach. 2 ¶¶ 16–18; *Dewey*, Docket Entry No. 196 Attach. 1 ¶ 7.)

After more than two years of discovery, the parties notified the Court that they were engaged in serious settlement discussions, but time was needed to obtain confirmatory discovery. As a result, in September 2009, the Court suspended the pretrial deadlines and set deadlines for the parties to file a joint motion for preliminary approval of a settlement class and class settlement, and for the appointment of class counsel. (*Dewey*, Docket Entry Nos. 154, 155, 157, 160, 162; *Delguercio*, Docket Entry Nos. 113, 114, 116, 118, 120.) At the time, class and merits fact discovery were scheduled to close on September 30, 2009, expert discovery was scheduled to be completed by January 27, 2010, and the Final Pretrial Conference was to occur on February 25, 2010. (*Dewey*, Docket Entry No. 149; *Delguercio*, Docket Entry No. 110.)

On November 10, 2009, the United States District Judge approved the parties' request to consent to Magistrate Judge jurisdiction "to conduct all settlement proceedings and enter final judgment," pursuant to 28 U.S.C. § 636(c).[6]

---

**6.** Under 28 U.S.C. § 636(c), a magistrate judge may conduct "any or all proceedings in a ... civil matter and order the entry of judgment in the case" upon consent of the parties. If consent of one of the parties is not given, a magistrate judge may still hear certain pretrial matters. 28 U.S.C. § 636(b)(1)(A). Here, all parties consented to have the magistrate judge "conduct all settlement proceedings and order the entry of final judgment" pursuant to § 636(c). (*Dewey*, Docket Entry No. 159.)

In class action lawsuits, unnamed class members generally "are not 'parties' before the court in the sense of being able to direct the litigation," because in representational litigation procedural safeguards are in place to ensure that the representative adequately represents the interests of the class. *Williams v. Gen. Elec. Capital Auto Lease,* 159 F.3d 266, 269 (7th Cir.1998); Fed.R.Civ.P. 23(a)(3)(4). As such, the unnamed class members are "bound by the plaintiffs' decision to consent to the magistrate judge's § 636(c) jurisdiction." *Stackhouse v. McKnight,* 168 Fed. Appx. 464, 466 n. 1 (2d Cir.2006); *Kingsbor-*

*ough v. Sprint Commc'ns Co.,* 673 F.Supp.2d 24, 30 (D.Mass.2009) (holding that unnamed class members are bound by the named class members' consent and are not "parties" for the purposes of § 636(c) despite their status as parties for the purpose of bringing an appeal); *see Williams,* 159 F.3d at 269. While the Supreme Court established that unnamed class members are "parties" for the purpose of appealing a ruling on their objection to a class action settlement and, thus, need not first intervene, the Court made clear that "considering non-named class members parties for the purpose of bringing an appeal [does not] conflict with any other aspect of class action procedure." *Devlin v. Scardelletti,* 536 U.S. 1, 14, 122 S.Ct. 2005, 153 L.Ed.2d 27 (2002). Thus, "the Court's decision in *Devlin* does not establish [that an unnamed class member is] a 'party' for purposes of § 636(c)." *Kingsborough,* 673 F.Supp.2d at 30.

Relying on *Stackhouse,* 168 Fed.Appx. at 467, certain objectors raise the possibility that other objectors can "later vacate a magistrate judge's dispositive order by arguing that they

(*Dewey*, Docket Entry Nos. 158, 159; *Delguercio*, Docket Entry No. 124.)

On January 29, 2010, the parties filed a joint motion for preliminary approval of a class settlement, preliminary approval of a settlement class, and appointment of class counsel. (*Dewey*, Docket Entry No. 163; *Delguercio*, Docket Entry No. 121.) A telephonic hearing on this motion was held on the record on February 3, 2010. The Court considered the written submissions, oral arguments, and governing law and directed that, no later than February 5, 2010, the parties submit revised proposed settlement documents that included certain provisions for notice to the putative class and changes to the type of documentation needed to obtain reimbursement (*Dewey*, Docket Entry No. 168; *Delguercio*, Docket Entry No. 125.) This deadline was ultimately extended until February 11, 2010. (*Dewey*, Docket Entry Nos. 171, 172; *Delguercio*, Docket Entry Nos. 125, 126.)

The Order granting preliminary approval of a settlement class, class settlement, and appointment of class counsel was signed on February 17, 2010, and entered on February 23, 2010. (*Dewey*, Docket No. 175; *Delguercio*, Docket No. 129.)

The Order was amended on March 26, 2010, and again on April 14, 2010. (*Dewey*, Docket No. 176, 178; *Delguercio*, Docket No. 130.) The Amended Preliminary Approval Order provides for preliminary certification of classes described as:

(a) all Persons, other than officers, directors, or employees of the defendants, who purchased or leased, new or used, the following settlement class vehicles:

- 2001–2007 Volkswagen New Beetle vehicles with Vehicle Identification Numbers (VINs) below 3VW—1C–7M514779, equipped with sunroof;
- 2001–2005 Jetta A4 Sedan with VINs with "9M" in position 7 and 8, and 2001–2005 Volkswagen Jetta Wagon A4 vehicles with VINs with "1J" in position 7 and 8, equipped with sunroof;
- 2001–2006 Volkswagen Golf A4, Volkswagen GTI A4 vehicles with VINs with "1J" in position 7 and 8, equipped with sunroof;
- 2005–2007 Volkswagen Jetta A5 vehicles with VINs with "1K" in position 7 and 8, equipped with sunroof;

---

are parties under § 636(c) and did not give consent to be heard by a magistrate judge." (*Dewey*, Docket Entry No. 232 at 5). Their reliance on *Stackhouse* is misplaced. First. *Stackhouse* addressed whether or not a motion to intervene is a dispositive motion that a magistrate judge in the Second Circuit can decide only with consent of the parties to the motion or whether it can only be addressed by way of a report and recommendation. There are no motions to intervene in the present case so this issue is not implicated. Second, even if there had been a motion to intervene filed, it is not viewed as a dispositive motion in this District. *In re Gabapentin Patent Litig.*, 312 F.Supp.2d 653, 661 (D.N.J. 2004) (stating that "a motion to intervene is typically treated as non-dispositive"); *United States. v. W.R. Grace & Co.-Conn.*, 185 F.R.D. 184, 187 (D.N.J.1999) (noting that it is "common practice in this district for a magistrate

judge to hear and determine a motion to intervene" in accordance with L. Civ. R. 72.1(a)(2), regardless of whether the parties consent to magistrate jurisdiction). Third, objectors do not have a right to intervene in a class action because intervention as a matter of right is inconsistent with the goal of Rule 23. *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 551–52, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974); *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 315 (3d Cir.2005). Finally, because no Rule 24 intervention motion was filed, the Court need not address whether such a motion, if granted, gives rise to the presence of a new "party" whose consent would be needed.

For all of these reasons, the Court finds that the named parties' consent to magistrate judge jurisdiction permits it to decide all issues related to the motions for final approval of the class settlement and attorneys' fees, as well as objections to both.

- 2006–2007 Volkswagen Golf/GTI A5 vehicles with VINs with "1K" in position 7 and 8, equipped with sunroof;
- 1999–2005 Volkswagen Passat B5 vehicles;
- 1997–2006 Audi A4 vehicles, B5 and B6 Platforms in MY[7] 2005, with VINs with "8E" in position 7 and 8 with also "J" or "L" or "V" or "P" or "X" in position 4, and in MY2005 and MY2006, with VINs with "8H" in position 7 and 8 (including Cabrio, S, and RS versions);
- 1998–2005 Audi A6 C5 vehicles with VINs with "4B" in position 7 and 8 (including Allroad, S, and RS versions);

and

(b) all persons, other than officers, directors, or employees of the defendants, who currently own or lease the following settlement class vehicles:

- 1998–2000 and 2007–2009 Volkswagen New Beetle with VINs 3VW—1C–7M514779 or higher, equipped with sunroof;
- 1997–1999 Volkswagen Jetta A3 with VINs with "1H" in position 7 and 8, 1999–2000 Volkswagen Jetta A4 with VINs with "9M" in position 7 and 8, and 2008–2009 Volkswagen Jetta A5 vehicles with VINs with "1K" in position 7 and 8, equipped with sunroof;
- 1997–1999 Volkswagen Golf/GTI A3 with VINs with "1H" in position 7 and 8, 1999–2000 Volkswagen Golf/GTI A4 with VINs with "1J" in position 7 and 8, and 2008–2009 Volkswagen Golf/GTI A5 vehicles with VINs with "1K" in position 7 and 8, equipped with sunroof;
- 1998 Volkswagen Passat B5 vehicles;
- 1997 Volkswagen Passat B4 and 2006–2009 Volkswagen Passat B6 vehicles equipped with sunroof;
- 2004–2009 Volkswagen Touareg vehicles;
- 2005–2008 Audi A4 B7 Platform vehicles equipped with sunroof, in MY2005, with VINs with "8E" in position 7 and 8 and also "A" or "D" or "K" or "G" or "U" in position 4 (including S and RS versions);
- 1997 Audi A6 C4 vehicles;
- 2005–2009 Audi A6 C6 vehicles equipped with sunroof with VINs with "4A" or "4F" in position 7 and 8 (including S and RS versions);
- 1997–2009 Audi A8 vehicles (including S versions).

The proposed settlement provides for: (1) educational preventative maintenance information for all class members; (2) inspection, modification, and repair of plenum and sunroof drain systems for certain qualifying class members; (3) monetary reimbursement for repair and vehicle damage for certain qualifying class members to be paid out of an $8 million reimbursement fund; (4) donation of all unclaimed reimbursement funds to an educational, charitable, or research facility after five years; and (5) payments of $10,000 to each representative plaintiff to be paid separate from the reimbursement fund. (*Dewey,* Docket Entry No. 174 Attach. 1 at 15–24; *Delguercio,* Docket Entry No. 128 Attach. 1 at 15–24.) The defendants also agreed to pay class counsel's fees and expenses, but no agreement concerning the amounts or method to calculate the fees was reached. (*Id.* at 36 ¶¶ 15.2–15.3.)

The Amended Preliminary Approval Order also directed that notice of the proposed settlement be communicated in the following ways: (1) direct mail to all origi-

---

**7.** The abbreviation "MY" means "model year."

nal and subsequent owners and lessees of settlement class vehicles for whom mailing address data is available; (2) establishment of a website with an electronic version of the mailed notice and claim form; and (3) publication in USA Today. (*Dewey,* Docket Entry No. 178; *Delguercio,* Docket Entry No. 130; *see Dewey,* Docket Entry No. 174 Attach. 1 at 25–27; *Delguercio,* Docket Entry No. 128 Attach. 1 at 25–27 and Docket Entry No. 130.) The summary notice was published in USA Today on May 7, 2010, and May 12, 2010, and notices, reimbursement forms (where applicable), and a revised maintenance schedule were mailed to 4,202,925 VW class members and 2,141,208 Audi class members. (*Dewey,* Docket Entry No. 216 ¶ 5; *Dewey,* Docket Entry No. 241 ¶ 3.) Most class members were given until June 15, 2010, to request exclusion from or file objections to the settlement. (*Dewey,* Docket Entry Nos. 176, 178; *Delguercio,* Docket Entry No. 130.) In June 2010, a second mailing was sent using updated addresses for owners and lessees of 579,088 class vehicles who did not receive the first mailed notice. (*Dewey,* Docket Entry No. 241 ¶ 3.) The opt-out/objection and claims deadlines for those who were sent this second mailing was extended until July 21, 2010, and August 30, 2010, respectively. (*Id.*)

The settlement administrator, Rust Consulting, established the court-ordered website which, as of July 22, 2010, had 19,891 unique visitors. (*Id.* ¶ 6.) As of July 22, 2010, Rust Consulting also received 1,961 emails and 14,918 claim forms. (*Id.* ¶¶ 6, 10.) Rust Consulting also established a toll-free number which, as of July 22, 2010, received 18,137 calls. (*Id.* ¶ 5.)

The Amended Preliminary Approval Order also appointed Mazie Slater Katz & Freeman and Schoengold & Sporn, P.C. (f/k/a Schoengold Sporn Laitman & Lometti, P.C.) as co-class counsel, and established deadlines for filing motions for final approval and for attorneys' fees and costs. (*Dewey,* Docket Entry No. 178 at 4–5; *Delguercio,* Docket Entry No. 130 at 4–5.) Subsequent Orders adjusted the deadlines to file motions for final approval of a settlement class and the class settlement, and for attorneys' fees and resolved disputes concerning confirmatory discovery. (*Dewey,* Docket Entry Nos. 181, 185, 191; *Delguercio,* Docket Entry Nos. 132, 134.)

Consistent with the Orders, on June 9, 2010, the plaintiffs filed their motion for attorneys' fees, seeking an award of $22.5 million. This number was based upon the plaintiffs' determination that the value of the settlement exceeded $142 million and their assertion that they were entitled to 15.83% of the settlement. (*Dewey,* Docket Entry Nos. 194–201.) On July 23, 2010, the parties notified the Court that the plaintiffs agreed to seek and the defendants agreed not to oppose having the settlement valued at $90 million. (*Dewey,* Docket Entry No. 238.) Despite the reduction in the value the plaintiffs assigned to the settlement, the plaintiffs repeated their request for the $22.5 million fee award [8] and asserted that it was based on their view that they are entitled to a fee equal to 25% of their revised settlement valuation of $90 million. (Fairness Hearing.)

In support of their valuation figure, the plaintiffs have submitted the expert reports of economist Dr. George Eads and

---

**8.** Counsel represent that the lawyers and paraprofessionals spent at least 12,195.5 hours on this case and that the lodestar amounts to $6,535,696.16 using what they assert are hourly rates used by other firms doing class action work. (*Dewey,* Docket Entry No. 195 Attach. 1 at 8–12; *Dewey,* Docket Entry No. 240 ¶ 5; *Dewey,* Docket Entry No. 242 Ex. 1.) In addition, the plaintiffs seek costs totaling $1,003,652.05. (*Dewey,* Docket Entry Nos. 194–201; *Dewey,* Docket Entry No. 240 at 4; *Dewey,* Docket Entry No. 242 Attach. 2.)

appraiser Mr. Richard Hixenbaugh and the defendants presented the expert reports of economist Dr. Janusz Ordover and automotive engineer Robert Lange. (*Dewey*, Docket Entry No. 219 at 35;.)

On June 17, 2010, the plaintiffs filed their motion for final approval of the settlement class and class settlement. (*Dewey*, Docket Entry No. 213.) On June 28, 2010, the defendants filed a brief joining in the request for final approval of the settlement but disputing the plaintiffs' characterization of the pretrial process, the value of the settlement, and the likelihood that the plaintiffs could succeed with class certification or prevail at trial. (*Dewey*, Docket Entry Nos. 215, 217.) In addition to the positions of the parties, the Court considered objectors from 203 putative class members[9] and was informed that 1,119 putative class members opted-out of the class and settlement. (*See Dewey*, Docket Entry No. 241 ¶ 8.)

On July 26, 2010, the Court conducted a Fairness Hearing. During the hearing, the Court heard oral arguments from the parties and objectors who sought to be heard and heard testimony from Dr. Eads.[10]

Based upon the record and the governing law, the Court makes the findings and conclusions set forth in this Opinion.

---

9. Rust Consulting reported receiving only 152 unique objections, (*Dewey*, Docket Entry No. 241 ¶ 9), but the Court has received additional and/or different objections, bringing the total to 203.

10. At the Fairness Hearing, counsel for certain objectors sought to cross-examine Dr. Eads. The Court denied the request because: (1) the objectors' counsel provided no notice of a desire to examine the witness; (2) the plaintiff and the Court both examined the witness; and (3) the objectors' counsel had the opportunity to challenge the expert's opinion both orally and in writing. Moreover, the record shows that the objections were considered and some of the questions class counsel

## III. *DISCUSSION*

### A. *Subject Matter Jurisdiction*

The Class Action Fairness Act of 2005 (CAFA) grants district courts original jurisdiction over any civil action involving a proposed class of at least 100 members " 'in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which ... any member of a class of plaintiffs is a citizen of a State different from any defendant.' " *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 261 (3d Cir. 2008) (citing the district court's application of 28 U.S.C. § 1332(d)(2)); *see also* 28 U.S.C. § 1332(d)(5)(B).

These requirements are satisfied here. First, the dispute involves more than one million class members. (*Dewey*, Docket Entry No. 213 Attach. 3 at 6.) Second, the amount in controversy exceeds $5,000,000 in the aggregate, exclusive of interest and costs. (*Dewey*, Docket Entry Nos. 86 ¶ 14 and 87 ¶ 12; *Delguercio*, Docket Entry No. 63 ¶ 12.) The monetary component of the settlement alone is $8,000,000. (*Dewey*, Docket Entry No. 174 ¶ 5; *Delguercio*, Docket Entry No. 128 ¶ 5.) Third, at least one named plaintiff is a citizen of a state different from the defendants. The named plaintiffs are citizens of

---

and the Court posed addressed concerns raised by various objectors. Furthermore, the parties represented that the objectors had access to the expert's deposition transcript. Thus, counsel for the objectors had sufficient information, without separate examination, to challenge the expert's opinion via oral argument. Because the record was adequate for the objectors' counsel to make his arguments and the Court to make its finding, his separate examination was not necessary. *Cf. In re Cmty. Bank of N. Va.*, 418 F.3d at 316 (finding that discovery by objectors is permissible only if the totality of the circumstances show that class counsel for the parties did not conduct adequate discovery or if the discovery was not available to the objectors).

Maryland, New Jersey, New York, and California. (*Dewey,* Docket Entry No. 86 ¶¶ 17, 20, 23, 26, 29; Docket Entry No. 87 ¶¶ 14–17; *Delguercio,* Docket Entry No. 63 ¶¶ 14–17.) Defendants VWAG and Audi AG are German companies, (*Dewey,* Docket Entry Nos. 90 ¶ 32 and 95 ¶ 35), while VWGoA is a New Jersey corporation and Audi of America is an unincorporated division of it. (*Dewey,* Docket Entry Nos. 89 ¶ 34 and 90 ¶¶ 34, 37 and 95 ¶ 37.) VWBG is a defunct German Corporation and Audi of America, LLC is a Delaware corporation. (*Dewey,* Docket Entry No. 86 ¶¶ 33, 36; Fairness Hearing; *Dewey,* Docket Entry Nos. 89 ¶ 33 and 94 ¶ 36.) Given that there are plaintiffs from New York, Maryland, and California and no defendant is a citizen of those states, CAFA's minimal diversity requirement is met. Therefore, this Court has subject matter jurisdiction over this case.

### B. *Personal Jurisdiction*

■ Personal jurisdiction exists over the parties because the defendants regularly do business in this District and the named plaintiffs have, by filing this action, voluntarily submitted to this Court's jurisdiction. As to out-of-state class members, sufficient notice of the settlement and an opportunity to object have been provided, (*Dewey,* Docket Entry Nos. 175, 176, 178, 181, 216), thereby satisfying due process and the requirements of Fed.R.Civ.P. 23(b)(3). *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812–13, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); *In re Prudential Ins. Co. of Am. Sales Practice Litig.,* 148 F.3d 283, 306 (3d Cir.1998) ("*In re Prudential*"); *Varacallo v. Mass. Mut. Life Ins. Co.,* 226 F.R.D. 207, 224 (D.N.J.2005).

### C. *Class Certification*

■ For the Court to certify a class, the plaintiffs must satisfy all of the requirements of Rule 23(a), and one of the requirements of Rule 23(b). Fed.R.Civ.P. 23(a)-(b). Class certification cannot be presumed and a class may be certified only after a rigorous analysis demonstrates that all Rule 23 requirements are met. *See In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 307 (3d Cir.2008). Even where a plaintiff seeks certification of a settlement class,[11] as opposed to formal class certification, courts "must consider the propriety of certification as if the case were to go to trial." *In re Prudential,* 962 F.Supp. at 508. With these rules in mind, the Court now addresses the class certification factors.

#### i. Rule 23(a)

Under Rule 23, a class action is appropriate when:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). These prerequisites are known as numerosity, commonality, typicality, and adequacy. *Baby Neal v. Casey,* 43 F.3d 48, 55 (3d Cir.1994). They are "meant to assure both that class action treatment is necessary and efficient and

---

**11.** A settlement class is "a device whereby the court postpones the formal certification procedure until the parties have successfully negotiated a settlement, thus allowing a defendant to explore settlement without conceding any of its arguments against certification."

*In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F.Supp. 450, 508 (D.N.J.1997) ("*In re Prudential*") (quoting *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 786 (3d Cir.1995) ("*In re Gen. Motors*")) (internal citations omitted).

that it is fair to the absentees ..." *Id.* The Court will address each in turn.

### a. The Class is So Numerous that Joinder of all Members is Impracticable

■■■ The Court must first consider whether the class is so numerous that joinder of all members is impracticable.[12] *See Varacallo,* 226 F.R.D. at 229 (noting that joinder of hundreds of individuals would be impracticable). The numerosity "requirement does not demand that joinder would be impossible, but rather that joinder would be extremely difficult or inconvenient." *Szczubelek v. Cendant Mortgage Corp.,* 215 F.R.D. 107, 116 (D.N.J. 2003); *see also McGee v. Cont'l Tire N. Am., Inc.,* Civ. No. 06–6234, 2009 WL 539893, at *10 (D.N.J. Mar. 4, 2009) (observing that it is impracticable to join 280,-000 geographically dispersed class members). While no minimum number of plaintiffs is required, "generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham,* 275 F.3d 220, 226–27 (3d Cir.2001); *see also In re Prudential,* 148 F.3d at 309 (holding that a proposed class of 8 million past and present policyholders satisfies the numerosity requirement). Moreover, a class must be large enough in number to ensure that, for efficiency purposes, the defendant is not subjected to multiple, similar lawsuits. Thus, to determine if numerosity is satisfied, a court should "consider the estimated number of parties in the proposed class, the expediency of joinder, and the practicality of multiple lawsuits." *Cannon v. Cherry Hill Toyota, Inc.,* 184 F.R.D. 540, 543 (D.N.J.1999) (citations omitted).

■■■ Here, the estimated number of class members exceeds 5.5 million. (*Dewey,* Docket Entry No. 213 Attach. 3 at 6.) The class definition includes owners or lessees of approximately 3 million 1997–2009 VW and Audi vehicles. (*Id.*) A lawsuit involving such a large number of individual potential plaintiffs would be inefficient, unwieldy, and difficult for both the Court and the parties to manage.[13] Moreover, absent a class approach, the defendants could be subjected to numerous similar lawsuits. Because the number of potential plaintiffs in this case makes joinder of all parties impractical, the Court finds that the numerosity requirement is satisfied.

### b. There are Questions of Law or Fact Common to the Class

■■■ Second, the Court must consider whether there are questions of law or fact shared among the named plaintiffs and all members of the class. For a class to satisfy the commonality requirement, "the named plaintiffs [must] share at least one question of fact or law with the grievances of the prospective class." *In re Prudential,* 148 F.3d at 310 (citing *Baby Neal,* 43 F.3d at 56). Though identical claims ease satisfaction of this requirement, "factual differences among the claims of the putative class members do not defeat certification." *Id.* at 311 (citations omitted). The key consideration is whether the class seeks a remedy to a grievance involving common questions of law and fact. *Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985). Thus, it is usually relatively simple to satisfy this requirement. *In re Ikon Office Solutions,*

---

**12.** Numerosity and commonality are both used to evaluate the sufficiency of the class itself. *See Hassine v. Jeffes,* 846 F.2d 169, 176 n. 4 (3d Cir.1988).

**13.** After *Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), "the manageability inquiry in settlement-only class actions may not be significant." *In re Prudential,* 148 F.3d at 321.

*Inc.,* 191 F.R.D. 457, 463 (E.D.Pa.2000) (hereinafter *"In re Ikon I"*).

While the Court acknowledges that the case involves multiple manufacturers, multiple car models, and multiple model years, some common factual and legal questions arise from complaints about the plenum and sunroof drain systems that each class member's vehicle contained. Factually, the systems serve the same purpose, namely to keep water from seeping into the vehicle, and the class representatives have all complained that the systems have failed to accomplish this purpose. (*Dewey,* Docket Entry Nos. 86 ¶ 3 and 87 ¶ 8; *Delguercio,* Docket Entry No. 63 ¶ 8.) Legally, the success of each claim hinges on similar facts and requires proof regarding the design of these systems and the maintenance instructions and whether they fulfilled their purposes. The named plaintiffs and the potential class members are situated such that the defendants owed them the same duties and the alleged failure to fulfill these duties allegedly caused the same damage to all class members. Accordingly, there are questions of law and fact common to the settlement class.

### c. The Claims of the Representative Parties are Typical of the Claims of the Class

Third, the Court must determine whether the claims of the representative plaintiffs are typical of those of the class members. Specifically, "[t]ypicality lies where there is a strong similarity of legal theories ... or where the claims of the class representatives and the class members arise from the same alleged course of conduct by the defendant." *In re Prudential,* 962 F.Supp. at 518 (internal citations omitted). This factor also considers "whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as

to assure that the absentees' interests will be fairly represented." *Baby Neal,* 43 F.3d at 57. Like the commonality requirement, however, all putative class members need not share identical claims. *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 531–32 (3d Cir.2004) (*"In re Warfarin"*). Indeed, "cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of varying ... fact patterns." *Stewart,* 275 F.3d at 227 (citation omitted). Put differently, the typicality requirement is met, regardless of factual differences, as long as the same unlawful conduct was directed at or affected both the plaintiffs and the absent class members. *In re Warfarin,* 391 F.3d at 531–32; *Cannon,* 184 F.R.D. at 544 (claims are typical if they arise from the same course of conduct and are based on the same legal theory).

In the present case, the named plaintiffs and each potential class member is or was an owner or lessee of one or more of the vehicles that the defendants designed and/or manufactured. Additionally, the named plaintiffs and the potential class members each owned or leased cars with the plenum or sunroof drain systems that allegedly failed to prevent water infiltration, and each either suffered or risked suffering water damage as a result. Moreover, each was allegedly provided insufficient maintenance instructions to avoid damage. (*Dewey,* Docket Entry Nos. 86 at 2–9 and 87 at 8, 10; *Delguercio,* Docket Entry No. 63 at 8, 10.) Thus, each potential class member was subjected to the same conduct in which the defendants engaged and this conduct forms the basis of the named plaintiffs' claims. Accordingly, the named plaintiffs' claims are typical of the claims of the other class members.

See Zinberg v. Washington Bancorp, Inc., 138 F.R.D. 397, 407 (D.N.J.1990).

### d. The Representative Parties Will Fairly and Adequately Protect the Interests of the Class

■ Fourth, the Court must be satisfied that the representative parties will "fairly and adequately protect the interests of the class." In re Warfarin, 391 F.3d at 532. This inquiry "has two components designed to ensure that absentees' interests are fully pursued." Id. (quoting Georgine v. Amchem Prods., Inc., 83 F.3d 610, 630 (3d Cir.1996)). First, the Court must assess whether the named plaintiffs' counsel will adequately represent the class. In re Warfarin, 391 F.3d at 532; In re Gen. Motors, 55 F.3d at 800. To this end, courts consider whether the plaintiffs' counsel is qualified, experienced, and able to conduct the litigation. In re Prudential, 148 F.3d at 312. Second, courts must evaluate "conflicts of interest between named parties and the class they seek to represent." In re Warfarin, 391 F.3d at 532. This requires the Court to determine whether or not there is " 'antagonism between [the named plaintiffs'] objectives and the objectives of the [class]', [which constitutes] a 'legally cognizable conflict of interest' between the two groups." In re Ins. Brokerage Antitrust Litig., Civ. No. 04–5184, 2007 WL 542227, at *15 (D.N.J. Feb. 16, 2007) (quoting Jordan v. Commonwealth Fin. Sys., Inc., 237 F.R.D. 132, 139 (E.D.Pa.2006)). A conflict will not be sufficient to defeat class certification "unless [that] conflict is apparent, imminent, and on an issue at the very heart of the suit." Id. (internal quotation marks omitted).

■ In the present case, the first prong of adequate representation is met. Class counsel Adam M. Slater and Samuel P. Sporn and their respective law firms are experienced in class action litigation and have prosecuted numerous class actions throughout the United States. (See Dewey, Docket Entry No. 195 Attach. 1 ¶ 4; Dewey, Docket Entry No. 196 Attach. 1 ¶¶ 1, 5.) Their conduct in this case is consistent with their well-deserved reputations. They conducted extensive discovery, investigated public and private sources of information relating to the claims, examined the evidence produced during discovery, consulted with a variety of technical automotive experts, and researched the law of all fifty states. (Dewey, Docket Entry No. 194 at 26–28; see Dewey, Docket Entry No. 196 Attach. 1 at 4–7.) Moreover, the record reflects hard fought motion practice on both discovery and merits issues that has continued even through the Fairness Hearing. (See, e.g., Dewey, Docket Entry Nos. 43, 46, 49, 51, 53, 70, 72, 73, 74, 75, 77, 78, 97, 99, 100, 102, 105, 111, 115, 117, 119, 124, 128, 129, 130, 131, 132, 138, 144, 145, 146, 147, 152, 153, 217, 219; Delguercio, Docket Entry Nos. 15, 26, 29, 30, 32, 47, 48, 53, 57, 58, 59, 69, 71, 72, 77, 103, 104, 111, 112, 114, 132.) In addition, they engaged in lengthy and complex settlement negotiations in an effort to resolve an alleged defect afflicting more than 3 million cars. (Dewey, Docket Entry No. 194 at 26; see Dewey, Docket Entry No. 196 Attach. 1 at 6–7; see also Dewey, Docket Entry No. 213 Attach. 3 at 6.) Together with the well-represented defendants, they devised a plan to address these alleged defects by offering class members, depending on their vehicle, repair of existing problems, reimbursement for past repairs, and information to prevent future damage. Accordingly, the Court finds that the attorneys are qualified, experienced, and able to conduct the litigation of this class action.

The second prong is also satisfied as there are no conflicts of interest between the named plaintiffs and the class members. The named plaintiffs are in the

same position as the class members because each of them owned or leased the subject vehicles that contained the allegedly defective plenum or sunroof drain system, received allegedly inadequate maintenance recommendations and, as a result, suffered the same injury. Like the putative class members, the named plaintiffs have an interest in obtaining redress for damage or avoiding future damage caused by the allegedly defective systems. Moreover, there is nothing before the Court to show that the proposed representatives have interests that differ from those of the class members at large. The fact that the relief class members receive may differ based upon the vehicle the member owned or leased does not reflect antagonism or differing interests. Rather, it reflects the compromise reached to address the frequency problems were reported for each model. Thus, the proposed class representatives are adequate.

Accordingly, the Court appoints Jacqueline Delguercio, Lynda Gallo, Francis Nowicki, Kenneth Bayer, John M. Dewey, Patrick DeMartino, Patricia Romeo, Ronald B. Marans, and Edward O. Griffin as class representatives and Adam M. Slater and his firm Mazie Slater Katz & Freeman LLC and Samuel P. Sporn and his firm Schoengold & Sporn, P.C. as co-lead class counsel.

### ii. Rule 23(b)

Having determined that the class satisfies Rule 23(a)'s requirements of numerosity, commonality, and typicality, and it has adequate representation, the Court now considers whether the proposed class falls within one of the categories set forth in Rule 23(b). The named plaintiffs seek class certification under Rule 23(b)(3) and, as such, must demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3); *see, e.g. Dal Ponte v. Am. Mortgage Express Corp.*, Civ. No. 04–2152, 2006 WL 2403982, at *4 (D.N.J. Aug. 17, 2006); *Cannon*, 184 F.R.D. at 545. The Court will address the predominance and superiority requirements in turn.

#### a. Predominance

■■■■ To determine whether common issues predominate over questions affecting only individual members, the Court must look at each claim upon which the plaintiffs seek recovery and identify the law that applies to the claim. *See In re Hydrogen Peroxide*, 552 F.3d at 311 (noting that the predominance inquiry requires an examination of the elements of the plaintiffs' claims "through the prism of Rule 23"). Once the court identifies the applicable law, it must determine whether generalized evidence exists to prove the elements of the plaintiffs' claims on a simultaneous, class-wide basis, or whether proof will be overwhelmed by individual issues. *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 210 (E.D.Pa.2000). While the "presence of individual questions ... does not mean that the common questions of law and fact do not predominate," *In re Ins. Brokerage Antitrust Litig.*, 2007 WL 542227, at *15 (quoting *Eisenberg*, 766 F.2d at 786), the predominance requirement demands that the issues in the class action be applicable to the class as a whole, and support at least one cognizable common cause of action, and involve common proof. *See Sullivan v. DB Invs.*, 613 F.3d 134, 152 n. 15 (3d Cir.2010); *Szczubelek*, 215 F.R.D. at 120.

■■■ In their Fourth Amended Complaints, the named plaintiffs seek relief for violations of the CFA, breach of express and implied warranties, negligent misrepresentation, fraud, unjust enrichment, breach of the duty of good faith and fair

dealing, and improper repair, based on defects in the sunroof drains or plenum drains in cars that the defendants designed and/or manufactured. (*Dewey,* Docket Entry Nos. 86 ¶¶ 70–121 and 87 ¶¶ 46–97; *Delguercio,* Docket Entry No. 63 ¶¶ 46–97.) Putting aside differences that may exist among the state laws for some of the state law claims asserted in plaintiffs' complaint, *see, e.g. Sullivan,* 613 F.3d at 152 n. 15, the plaintiffs state that their primary claim is breach of express warranty. (*Dewey,* Docket Entry No. 194 Attach. 1 at 6 n. 5, 8; Fairness Hearing.) As the Hon. Harold A. Ackerman observed, the state laws on express warranty are similar. *In re Ford Motor Co. E–350 Van Prods. Liab. Litig. (No. II),* Civ. No. 03–4558, slip op. at 10 (D.N.J. Sept. 3, 2008). Moreover, liability for all of the claims will depend on evidence about the design of the plenum or sunroof drains and whether or not they fulfilled their purpose. In addition, proof of some of the claims will depend upon the sufficiency of the maintenance instructions that the defendants distributed to the class, the warranties that the defendants provided, and whether they fulfilled their purposes. *See id.* Thus, similar evidence will be offered regardless of the individual class member's vehicle model or year. Moreover, all class members seek recovery based upon common legal theories for similar damages that each class member sustained or could sustain because the plenum or sunroof drain failed to keep water out or because the maintenance requirements were not clearly conveyed.[14] Accordingly, individual inquiries will not predominate over the common questions of fact and law, at least as to the express warranty claim, that are shared among members of the potential class. Therefore, the predominance factor is satisfied.

### b. Superiority

 Next, the Court considers whether or not a class action is a superior method of fairly and efficiently adjudicating the controversy. Rule 23(b)(3) provides a non-exhaustive list of factors to be considered when making this determination. These factors include;

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed.R.Civ.P. 23(b)(3). An analysis of each factor demonstrates that a class action is a superior method of addressing this dispute.

With regard to the first factor, it is not clear that the individual class members would have an interest in controlling the prosecution of individual actions given the limited amount each plaintiff could recover. The maximum recovery of each individual is likely the actual value of the repair and clean up for damage that actually occurred. Given the cost to file an individual suit ($350.00) and the expenses required to litigate the case, which would require retention of design experts, it is not apparent that the money potentially recoverable by an individual class member is large enough to make individual litiga-

---

**14.** Unlike in *Sullivan,* there is no claim that the plaintiffs lack standing to pursue at least one of the alleged causes of action.

tion a realistic possibility. *Florence v. Bd. of Chosen Freeholders of Burlington,* Civ. No. 05–3619, 2008 WL 800970, at *13–14 (D.N.J. Mar. 20, 2008); *Jones v. Commerce Bancorp, Inc.,* Civ. No. 05–5600, 2007 WL 2085357, at *4 (D.N.J. July 16, 2007). Moreover, denying certification would require each owner or lessee to file suit individually at the expense of judicial economy. *In re Wellbutrin Sr Direct Purchaser Antitrust Litig.,* Civ. No. 04–5525, 2008 WL 1946848, at *9 (E.D.Pa. May 2, 2008).

The other factors also each weigh in favor of certification. Regarding the second factor, there is no evidence of any other litigation involving the claims asserted in the present case. The third factor also favors certification because efficiency makes it " 'desirable to litigate similar, related claims in one forum.' " *Florence,* 2008 WL 800970, at *14 (quoting *Cannon,* 184 F.R.D. at 546); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig,* 174 F.R.D. 332, 351 (D.N.J.1997). The fourth factor points to the superiority of a class approach because there is nothing before the Court to suggest difficulty in managing this case as a settlement class action. In fact, "litigating all claims together avoids the risk of inconsistent results for [the d]efendant and for all direct purchasers." *In re Wellbutrin,* 2008 WL 1946848, at *10. In short, a class action here promotes judicial efficiency, avoids inconsistency, and provides a single forum to resolve numerous common claims.

For these reasons, the Court finds that the plaintiffs have satisfied Rule 23(a) and 23(b)(3). Thus, the Court certifies the class for settlement purposes. The Court next turns to the question of whether the settlement agreement should be approved.

**D. *Fairness of the Class Action Settlement***

Rule 23(e) requires court approval of any class action settlement and sets forth procedures to be followed for deciding whether approval should be granted.[15] Fed.R.Civ.P. 23(e); *Varacallo,* 226 F.R.D. at 235. The procedures "strengthen the process of reviewing proposed class-action settlements" and "assure adequate representation of class members who have not participated in shaping the settlement." Fed.R.Civ.P. 23(e) advisory committee's note (2003 Amendments). Rule 23(e) requires the Court to follow these procedures and "make findings that support the conclusion that the settlement is fair, reasonable, and adequate. The findings must be set out in sufficient detail to explain to class members and the appellate court the factors that bear on applying the standard." *Id.*

---

**15.** Specifically, Rule 23(e) provides:

The claims, issues, or defenses of a certified class may be settled . . . only with the court's approval. The following procedures apply to a proposed settlement . . . (1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal. (2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate. (3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

(4) If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so. (5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

Fed.R.Civ.P. 23(e).

The Court approaches the parties' request for approval of their settlement mindful of its obligation under Rule 23 and the fact that "[t]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *In re Gen. Motors,* 55 F.3d at 784. In *Weiss v. Mercedes–Benz of N. Am.,* 899 F.Supp. 1297, 1300 (D.N.J. 1995), former Chief Judge John W. Bissell observed that this policy is further supported by the advantages to the parties of a settlement as they "have far greater control of their destiny than when a matter is submitted to a jury" and reflects the consideration that "the time and expense that precedes the taking of such a risk can be staggering." The Court of Appeals reiterated these benefits in *Ehrheart v. Verizon Wireless,* 609 F.3d 590, 594–95 (3d Cir.2010), in which it stated that settlements conserve judicial resources and enable the parties to avoid the costs and risks of a complex trial.

■ Here, the settlement requires the defendants to provide certain benefits to owners or lessees of particular VW and Audi vehicles. The benefits available to the class members vary depending upon the frequency of drain problems for the make and model of their vehicle. Under its terms, all class members receive educational preventative maintenance materials, including mailings that recommend inspections and cleaning of the sunroof and plenum drain systems. (*Dewey,* Docket Entry No. 173 Attach. 1 at 16; *Delguercio,* Docket Entry No. 127 Attach. 1 at 16.) Some class members who own particular vehicle models receive vehicle cleaning and inspection, while others may have valves in the sunroof drain removed, and still others may receive reimbursement from an $8 million fund for expenses incurred for repairs, carpet cleaning, or carpet replacement. (*Dewey,* Docket Entry No. 173 Attach. 1 at 15–19; *Delguercio,*

Docket Entry No. 127 Attach. 1 at 15–19.) Certain vehicles will receive repair or replacement of the transmission control module and/or its attached wiring harness. (*Dewey,* Docket Entry No. 173 Attach. 1 at 17–18; *Delguercio,* Docket Entry No. 127 Attach. 1 at 17–18.)

Notice of the proposed settlement was transmitted to the settlement class pursuant to the Amended Preliminary Approval Order, using the best practicable notice methods under the circumstances. (*Dewey,* Docket Entry No. 178 at 5–6; *Delguercio,* Docket Entry No. 130 at 5–6.) Specifically, notice was: (1) mailed to more than 5 million owners and lessees, using vehicle registration records from all fifty states to identify those in possession of vehicles covered by the settlement; (2) published on two separate dates in USA Today; and (3) provided through a website established for the purpose of posting the notice, claims forms, settlement agreement, and other relevant documents. (*Dewey,* Docket Entry No. 178 at 6 ¶ 8; *Delguercio,* Docket Entry No. 130 at 6 ¶ 8; *Dewey,* Docket Entry No. 213 Attach. 4 ¶ 9; *see also Dewey,* Docket Entry No. 174 at 25–27; *Delguercio,* Docket Entry No. 128 at 25–27.) The effectiveness of the notice is demonstrated by the class members' responses. For instance, Rust Consulting's website had 19,891 unique visitors as of July 22, 2010. (*Dewey,* Docket Entry No. 241 ¶ 3.) Rust Consulting also received 1,961 emails, 14,918 claim forms, and more than 18,137 telephone calls as of July 22, 2010. (*Dewey,* Docket Entry No. 241 ¶¶ 5–6, 10.)

The Amended Preliminary Approval Order and the settlement agreement also provide that any person included within the class may choose to be excluded from the class by submitting a written request for exclusion postmarked no later than June 15, 2010, (*Dewey,* Docket Entry No. 178 at 6–7 ¶¶ 9–10; *Delguercio,* Docket

Entry No. 130 at 6–7 ¶¶ 9–10; *Dewey,* Docket Entry No. 174 at 32; *Delguercio,* Docket Entry No. 128 at 32), with the exception of a group of 579,088 putative class members to whom notice was re-sent, who had until July 21, 2010 to request exclusion. (*Dewey,* Docket Entry No. 241 ¶ 3.) Approximately 1,119 have exercised their right to opt-out, (*Dewey,* Docket Entry No. 241 ¶ 8), and over 200 have lodged written objections. *Id.* These responses indicate that the class received and understood the notice.

Moreover, the claims process is reasonable. As stated above, as of July 22, 2010, Rust Consulting has received 14,918 claims forms, (*Dewey,* Docket Entry No. 241 ¶ 10), and a substantial number of eligible class members have already received concrete benefits from the settlement. For instance, as of July 23, 2010, 78% of those eligible for the P9 and P9/66C8 Service Actions, which benefit MY2002 and certain MY2001–2005 VW Passat vehicles, and 79% of those eligible for the JU service action, which apply to certain MY2002 Audi A4, Audi A6, and Audi allroad vehicles, have taken advantage of those service action benefits. In addition, 97,711 vehicles have taken advantage of the 60A7/S9 service action, which applies to MY2001–2007 New Beetles, MY 2001–2006 A4 Golf/GTIs, and MY2001–2005 A4 Jettas. (*Dewey,* Docket Entry No. 240 at 5.) That so many class members have sought these inspections and repairs indicates the reasonableness of the claims process and the available relief. In addition, a claims form is available for those class members entitled to reimbursement for out-of-pocket expenses that does not require submission of receipts if they are not available, which thereby eases the burden on the claimants. (*Dewey,* Docket Entry No. 173 Attach. 4 ¶ 3.)

These events show that the putative class received valid, due, and sufficient notice of the settlement and these proceedings. Accordingly, the notice complies with due process requirements, and Rule 23(e) is thereby satisfied.

Furthermore, experienced counsel on both sides seek approval of the settlement. (*See Dewey,* Docket Entry No. 213 Attach. 4 ¶ 2; *Dewey,* Docket Entry No. 213 Attach. 5 ¶ 3; *see also* Docket Entry No. 217 at 25 (reflecting the defendants' agreement that the settlement should be approved).) Experienced class counsel's approval is entitled to considerable weight and favors finding that the settlement is fair. *See In re Cendant Corp. Litig.,* 264 F.3d 201, 233 n. 18 (3d Cir.2001) (*"In re Cendant"*) (quoting *In re Gen. Motors,* 55 F.3d at 785); *In re Warfarin,* 391 F.3d at 535; *Varacallo,* 226 F.R.D. at 240. Even with counsel's concurrence, however, the Court must carefully examine the fairness and reasonableness of the settlement, as it serves as a fiduciary that "guard[s] the claims and rights of the absent class members." *Ehrheart,* 609 F.3d at 593.

In this Circuit, the factors set forth in *Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir.1975), are used to determine whether a class settlement is fair and reasonable. *See In re Warfarin,* 391 F.3d at 534–35. The *Girsh* factors are;

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery; and

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh,* 521 F.2d at 157 (quotation marks and alterations omitted). In addition, in *In re AT & T Corp.,* 455 F.3d 160, 165 (3d Cir.2006), the appellate court observed that:

district courts should also consider other potentially relevant and appropriate factors, including, among others: '[T]he maturity of the underlying substantive issues, as measured by the experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved-or likely to be achieved-for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*In re AT & T Corp.,* 455 F.3d at 165 (quoting *In re Prudential,* 148 F.3d at 323) (internal quotation marks omitted). The Court has considered all of these factors to the extent they are applicable to decide whether to approve or reject the proposed class action settlement.

### i. The Complexity, Expense, and Likely Duration of the Litigation

First, the Court must consider the complexity, expense, and likely duration of the litigation. The purpose of this factor is " 'to capture the probable costs, in both time and money, of continued litigation.' " *In re Ikon Office Solutions Secs. Litig.,* 209 F.R.D. 94, 104 (E.D.Pa.2002) (hereinafter *"In re Ikon II"*) (quoting *In re Gen. Motors,* 55 F.3d at 812). In short, "[b]y measuring the costs of continuing on the adversarial path, a court can gauge the benefit of settling the claim amicably." *In re Gen. Motors,* 55 F.3d at 812.

██ Here, at the time the parties executed a settlement agreement, more than two and a half years had already passed since the lawsuit commenced and, without a settlement, the "adversarial path" would have stretched for years longer. The parties had yet to complete expert discovery, engage in dispositive motion practice, go to trial, or pursue any potential appeals. Accordingly, in the event this settlement is not approved, the parties will be forced to re-commence contentious litigation, which would undoubtably result in the expenditure of significant resources. Avoiding these potential protracted proceedings favors settlement. *Id.* at 812; *In re Cendant Corp. Derivative Action Litig.,* 232 F.Supp.2d 327, 333 (D.N.J.2002) (*"In re Cendant Derivative"*) (stating that disputed questions of liability and damages " 'would involve fairly complex and protracted litigation' ") (quoting *In re Cendant,* 264 F.3d at 234). Therefore, this factor weighs in favor of approving the settlement.

### ii. The Reaction of the Class to the Settlement

██ The second factor the Court must consider is the reaction of the settlement class to the settlement. Under this factor, courts "attempt [ ] to gauge whether members of the class support the settlement."

*In re Warfarin,* 391 F.3d at 536 (internal quotations and citations omitted). Courts do this by looking at the "number and vociferousness of the objectors." *In re Gen. Motors,* 55 F.3d at 812. While courts "generally assume [ ] that 'silence constitutes tacit consent to the agreement,'" the "practical realities of class actions [have] led some courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement." *Id.* (quoting *Bell Atl. Corp. v. Bolger,* 2 F.3d 1304, 1313 n. 15 (3d Cir.1993)) (recognizing that "[e]ven where there are no incentives or informational barriers to class opposition, the inference of approval drawn from silence may be unwarranted").

■ In the present case, with the potential class of over 5 million members,[16] less than 1% objected and only one state's attorney general raised a concern about one component of the settlement. (*Dewey,* Docket Entry No. 213 Attach. 4 ¶ 11; *Dewey,* Docket Entry No. 213 Attach. 5 ¶ 6.) The small number of objections to the settlement itself may be indicative of endorsement. *See In re Prudential,* 148 F.3d at 318; *Stoetzner v. U.S. Steel Corp.,* 897 F.2d 115, 118–19 (3d Cir.1990) (10% objection rate indicates class favors settlement);

*Bolger,* 2 F.3d at 1313–14; *Weiss,* 899 F.Supp. at 1301 (a small percentage of objections allows an inference that a majority silently consents); *Varacallo,* 226 F.R.D. at 237–38. Moreover, as set forth herein, none of the objections support a finding that the settlement is not fair or reasonable. *Bailey v. AK Steel Corp.,* Civ. No. 06–468, 2008 WL 495539, at *4 (S.D.Ohio Feb. 21, 2008) (stating that the "existence of objections does not mean that the settlement is unfair ... [and] it is clear under the applicable law that even a majority opposition to a settlement cannot serve as an automatic bar to a settlement" that a court finds to be fair).

#### a. Objections to the Settlement

Under Rule 23(e)(5), "[a]ny class member may object to the proposal if it requires court approval under this subdivision (e)...." Fed.R.Civ.P. 23(e)(5). As previously noted, notice was sent to more than 5 million class members, and the Court received 203 objections to the settlement. More than 180 objections were submitted directly by putative class members. In addition, nine attorneys presented objections on behalf of approximately sixteen objectors.[17] Plaintiffs note that several of these attorneys [18] have been described as "professional objectors" and their positions

---

**16.** *Dewey,* Docket Entry No. 216 at 4 (6,344,-133 total class members consisting of 4,343,-668 current owners and the remainder former owners; no mention of current or past vehicle number); *Dewey,* Docket Entry No. 196 Attach. 1 ¶ 3 (6.4 million notices sent to owners of approximately 3 million vehicles); *Dewey,* Docket Entry No. 213 ¶ 9 (6,344,133 pieces of mail sent to approximately 5.5 million individuals).

**17.** Objectors Sally J. van Haitsma, Tara Castaldo, and Michael A. Brusca (represented by Forrest S. Turkish); Objector David Sacks (represented by Douglas A. Cole); Objectors David Stevens and Orion Antique Importer, Inc. (represented by Thomas L. Cox, Jr.); Objectors Robert and Katherine Falkner (represented by Edward Cochran); Objector J.M.

Cooper (represented by Chris M. Trepagnier); Objectors Joshua West, Lester Brickman, Darren McKinney, and Michael Sullivan (represented by Theodore H. Frank (*pro hac vice*) and David M. Nieporent (local)); Objector Paul M. Kaufman (represented by Vincent S. Verdiramo (local) and Edward F. Siegel (*pro hac vice*)); and David T. Murray and James E. Pentz (represented by John J. Pentz).

**18.** Edward Cochran (representing Objectors Robert and Katherine Falkner); Theodore H. Frank (*pro hac vice*) (representing Objectors Joshua West, Lester Brickman, Darren McKinney, and Michael Sullivan); Edward F. Siegel (*pro hac vice*) (representing Objector Paul M. Kaufman); and John J. Pentz (representing David T. Murray and James E. Pentz).

have not always been well-received,[19] (*Dewey*, Docket Entry No. 213 at 35–37.) While "federal courts are increasingly weary of professional objectors," *O'Keefe v. Mercedes–Benz U.S.A., LLC*, 214 F.R.D. 266, 295 n. 26 (E.D.Pa.2003) (citation omitted), the Court has considered all objections, including those not timely filed, and finds none warrant rejection of the settlement.[20]

### 1. The Suit is Meritless

■ Thirty-five class members question the merits of this case.[21] Some state

---

**19.** See *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir.2005) (faulting Pentz for failing to articulate his client's argument and putting forth "conclusory assertions" in his client's written objection); *In re Wal–Mart Wage and Hour Employment Practices Litig.*, Civ. No. 06–225, 2010 WL 786513, at *1 (D.Nev. Mar. 8, 2010) (finding that Pentz, Siegel, and Cochran have a "documented history of filing notices of appeal from orders approving other class action settlements, and thereafter dismissing said appeals when they and their clients were compensated by the settling class or counsel for the settling class"); *Lonardo v. Travelers Indem. Co.*, 706 F.Supp.2d 766, 785–86 (N.D.Ohio 2010) (calling Frank's brief "long on ideology and short on law" when he failed to cite a single case); *In re Initial Public Offering Sec. Litig.*, 671 F.Supp.2d 467, 497 n. 219 (S.D.N.Y.2009) (noting that Pentz has been criticized by other courts for submitting "canned objections"); *In re UnitedHealth Group Inc. PSLRA Litig.*, 643 F.Supp.2d 1107, 1109 (D.Minn.2009) (holding that Siegel and other professional objectors "conferred no benefit whatsoever on the class or on the Court" and calling their pleadings "disingenuous," "outlandish," "laughable," and an attempt to "hijack as many dollars as they can wrest from a negotiated settlement"); *Perez v. Asurion Corp.*, Civ. No. 06–20734, 2007 WL 2591180, at *8 (S.D.Fla. Aug. 8, 2007) (stating that the court "did not find any of the papers filed by [Siegel] to be particularly helpful"); *In re AOL Time Warner ERISA Litig.*, Civ. No. 02–8853, 2007 WL 4225486, at *3 (S.D.N.Y. Nov. 28, 2007) (calling Pentz and Tsai's arguments "counterproductive" and "irrelevant or simply incorrect"); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F.Supp.2d 383, 386 (D.Md.2006) (noting that Pentz is a professional objector who attached himself to a plaintiff and holding that his objection was "not well reasoned and was not helpful"); *In re Rent–Way Sec. Litig.*, 305 F.Supp.2d 491, 520 n. 12 (W.D.Pa.2003) (denying objector Douglas A. Cole's application for attorneys' fees and noting an accusation by the plaintiffs' attorney that Cole tried to "strike a separate, more favorable settlement for [his] client in derogation of [lead counsel's] fiduciary responsibilities to the Class as a whole"); *In re Twinlab Corp. Sec. Litig.*, 187 F.Supp.2d 80, 88 (E.D.N.Y.2002) (noting that Cole filed a sixteen-page objection which he later withdrew after plaintiffs' counsel agreed to pay him an amount "considerably more than [what] many, if not most, of the members of the class" received).

**20.** Counsel for objectors West, Brickman, McKinney, and Sullivan also submitted opposition to the motion for final approval on July 12, 2010 based upon a claim that L.Civ.R. 7.1 governed the deadline for a response. (*Dewey*, Docket Entry No. 230.) Their brief will not be considered. First, the objectors had a time frame to submit their positions and the July 12, 2010 brief was filed after the deadline. Second, the deadlines for opposition to the motion for attorneys' fees and final approval were June 29, 2010, and June 28, 2010, respectively, not July 12, 2010. (*Dewey*, Docket Entry No. 178 ¶ 15; Docket Entry No. 185 at 2; L. Civ. R. 7.1 (setting forth time frames for opposition Briefs that apply only if a court order does not modify them)). Since an order governed the briefing schedule, it supersedes Rule 7.1(d)(2) and as a result the West Objectors' July 12, 2010 brief is untimely.

**21.** The thirty-five class members objecting to the merits of the suit are: Alan E. Peters, Anthony Joseph Ganino, Barbara Stevens, Bob Ellson, Brenda C. Rogers, Bruce Crain, Chris Hurdleston, Clyde Hart, Dennis D. Goodwin, Elliott L. Grosh, Frank R. Bacque, Gary Kueffer, Gene Zarwell, Georg H. Strasser, George H. Kuper, Gilbert Ribal, Greg Hammaren, Jacob Allen Fritz, Jill E. Knack, Jim Herman, Jocelyn M. Wychgram, John Clay, John Sabol, Kay Beth B. Roberts, Lewis F. Staples, Marianne Lisenko, Matthew Phillips, Maxine Hart, Nicholas Bentivegna, P. Aarne Vesilind, Robert D. Hilton, Daniel C. Hauck, Glenn Groeschel, and William G.

that they have experienced no water damage problems. Others claim that any water damage is only attributable to an owner's failure to clean the car's roof These are the types of assertions a defendant may make to avoid liability. The Court's obligation when evaluating a class settlement is not to protect the defendants but rather "to ensure that other unrepresented parties (absent class members) and the public interest are fairly treated by the settlement reached between the class representatives and the defendants." *Ehrheart*, 609 F.3d at 594 (quoting *Collins v. Thompson*, 679 F.2d 168, 172 (9th Cir. 1982)). The Court's "fiduciary protection," however, "does not extend to defendants in a class action, who are in a position to protect their own interests during negotiations." *Id.* Here, the defendants have had the opportunity to protect their own interests and have agreed to a settlement. Moreover, for reasons stated elsewhere in this Opinion, the claims here survived motions to dismiss, and sufficient evidence has been developed to suggest that a design issue led to water ingress and that the design issue needed to be addressed. Therefore, objections asserting that this suit lacks merit are themselves without merit.

## 2. Attorneys' Fees

One hundred and six objectors [22] opposed the plaintiffs' multimillion dollar request for attorneys' fees.[23] Some objectors called the request "outrageous,"[24] "obscene,"[25] "astronomically ridiculous,"[26] "super-sized,"[27] and "legal blackmail."[28] Distilled to their core, the objections con-

Cottrell. One of the thirty-five objectors submitted concerns anonymously, and the Court has carefully considered those objections as well.

**22.** One objector has the mistaken impression that she would be liable for attorneys' fees under the settlement agreement. Since this is not the case, this objection does not provide a basis to reject the settlement.

**23.** The 106 class members objecting to the requested attorneys' fees are: Alan E. Peters, Katherine Falkner, Robert Falkner, Tom Luther, Joshua West, Darren McKinney, Lester Brickman, Michael Sullivan, Orion Antique Importer, Inc., David Stevens, James E. Pentz, David T. Murray, Jennifer B. Murray, Richard L. Whynot, Andra T. Gailis, Andrew Stryker, W. Andrew Fry, Brenda C. Rogers, Eric B. Martin, Alison G. Monroe, Charles C. Soltan, Anthony Joseph Ganino, Barbara Stevens, Benjamin Herta, Bob Ellson, Bonnie J. Friedman, Bruce Crain, Carl S. Paganelli, Charles H. Powers, Charles T. Major, Chris Hurdleston, Clyde Hart, Cynthia A. Albert, Daniel Sibley, Daryl Cornell, David A. Hale, Dennis D. Goodwin, Douglas B. Quine, Edward F. Lowe, Elliott L. Grosh, Eva G. Jalakas, Frank Lipsius, Frank R. Bacque, Gareth W. Neumann, Gary Kueffer, Geoffrey C. Jones, Georg H. Strasser, George H. Kuper, George Jones, Gera L. Witte, Gilbert Ribal, Gordon K. Roth, Greg Hammaren, Holger Berndt, Jacob Allen Fritz, James A. Klimchuk, Jeff Van Horne, Jason T. Fry, Jill E. Knack, Joanna B. Strauss, John Roberts, John Baker, John Clay, John Dean Jude, John F. Malloy, John R. Miller, John Sabol, John Waldeisen, Kay Beth B. Roberts, Kevin Byrnes, Leah J. Hampton, Lewis F. Staples, Linda Lowe, Marianne Lisenko, Mark E. Merin, Matthew Phillips, Maxine Hart. Michael Balch, Glenn Groeschel, Michael A. Brusca, Nicholas Bentivegna, Norbert Lindenberg, Pamela Kulsrud Corey, Patrick Essen, Patrick H. Yanke, Paul M. Kaufman, Robert D. Hilton, Robert Giesen, Robert J. Leger, Ronald D. Geiszler, J.M. Cooper, Sally J. van Haitsma, Stephen Michelin, Stephen R. Christian, Stephen R. Marsh, Tara Castaldo, Thomas Dietterich, Thomas Ross, Thomas Ward, Timothy L. Burke, Troy Corey, Vincent L. Garlick, Wayne D. Klocko, William G. Cottrell, and William W. Galvin III. One of the 106 objectors submitted concerns anonymously, and the Court has carefully considered those objections as well.

**24.** Objection letter of Jill Knack.

**25.** Objection letter of Dennis D. Goodwin.

**26.** Objection letter of Jacob Allen Fritz.

**27.** Objection letter of Daryl Cornell.

**28.** Objection letter of William W. Galvin, III.

cern: (1) the purported value of the settlement;[29] (2) the use of a multiplier to enhance the lodestar;[30] (3) the failure to limit attorneys' fees pursuant to New Jersey state law;[31] (4) calculation of attorneys' fees using the maximum potential recovery of the settlement benefits; (5) designation of the settlement fund as a "common fund;"[32] (6) application of the percentage-of-recovery approach;[33] (7) the ratio of attorneys' fees to the settlement fund;[34] (8) the amount of attorneys' fees sought compared to awards in other cases; (9) the failure of the notice to state the basis of the fee request;[35] (10) the failure to notify the class members of class counsel's fee request pursuant to Rule 23(h);[36] and (11) the award of attorneys' fees as an amount independent of the settlement fund.[37] The Court has considered each of these objections, applied the governing law to the facts, and, for the reasons set forth elsewhere in the Opinion, granted an award far less than the $22.5 million requested.

### 3. Compensation for Class Representatives

Five class members objected to an award of $10,000 to each of the nine class representatives.[38] Although the objectors assert that "ten thousand dollars for each plaintiff is far too much,"[39] incentive awards are "not uncommon in class action litigation ... particularly where ... a common fund has been created for the benefit of the entire class.... In fact, [c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 145 (E.D.Pa.2000) (citing *In re S. Ohio Corr. Facility*, 175 F.R.D. 270, 272 (S.D.Ohio 1997)). Courts have approved incentive awards for class representatives in amounts similar to the amount requested here. *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 285 (3d Cir.2009) (finding that the district court did not err in granting final approval of a settlement that included $150,000 in incentive awards distributed amongst fifteen class representatives); *Bogosian v. Gulf Oil Corp.*, 621 F.Supp. 27, 32 (E.D.Pa.1985) (granting incentive awards of $20,000 to each class representative). For reasons stated elsewhere in this Opinion, the law permits

**29.** Objectors who raised these concerns include David T. Murray, Jennifer B. Murray, James E. Pentz, Timothy L. Burke, Sally J. van Haitsma, Tara Castaldo, and Chris Hurdleston.

**30.** Objectors who raised these concerns include David T. Murray, Jennifer B. Murray, and James E. Pentz.

**31.** Objectors who raised these concerns include David T. Murray, Jennifer B. Murray, and James E. Pentz.

**32.** Objectors who raised these concerns include Pamela Kulsrud Corey and Troy Corey.

**33.** Objectors who raised these concerns include Pamela Kulsrud Corey and Troy Corey.

**34.** Objectors who raised these concerns include Bonnie J. Friedman and David A. Hale.

**35.** Objectors who raised these concerns include David T. Murray, Jennifer B. Murray, James E. Pentz, Joshua West, Lester Brickman, Darren McKinney, Glenn Groeschel, and Michael Sullivan.

**36.** Objectors who raised these concerns include David T. Murray, Jennifer B. Murray, and James E. Pentz.

**37.** Objectors who raised these concerns are: Joshua West, Lester Brickman, Darren McKinney, and Michael Sullivan.

**38.** The four class members objecting to compensation for class representatives include Anthony Joseph Ganino, Kay Beth B. Roberts, and Stephen R. Christian.

**39.** Objection letter of Kay Beth B. Roberts.

incentive awards, the facts here support an award, the parties have agreed to the amount, and the payment does not diminish the money available to the class. For these reasons, the objections to the award of $10,000 to each class representative are overruled.

### 4. The Settlement Does Not Adequately Compensate Class Members

One hundred and four class members assert that the settlement provides inadequate relief for their injuries.[40] Many object to capping the reimbursement fund at $8 million and express concern that, given the size of the class, the settlement fund "may be insufficient to satisfy 100% of timely and legitimate reimbursement claims by class members." [41] Others indicated that the revised maintenance schedule and maintenance book insert are insufficient relief in light of the monetary damage they incurred as a result of water ingress. Still others listed expenses that they contend are not reimbursable under the terms of the settlement, includ-

ing costs to replace or repair vehicle headliners, carpeting, transmissions, and electrical systems. Many provided documentation of expenses incurred trying to remove mold and mildew resulting from water ingress and requested that these expenses be covered in the settlement. Finally, two of the objectors assert that the defendants are not bearing future maintenance expenses related to water ingress. One objector was displeased that any remaining settlement funds will be donated to charity rather than being redistributed to class members.[42] Others complain that they are excluded from receiving compensation for insurance deductibles, repairs not yet performed, inspections to determine if the vehicle has suffered damage, car rentals, and the financial loss incurred when the vehicle was salvaged.

While the Court recognizes the dissatisfaction these class members have expressed, their objections do not show that the settlement is unreasonable or unfair. When evaluating the fairness of settle-

---

**40.** The 104 class members who challenged the adequacy of the compensation are: Daniel C. Hauck, Sean M. McLain, Michael Pipito, Joshua West, Darren McKinney, Lester Brickman, Michael Sullivan, Randy L. Warren, Orion Antique Importer, Inc., David Stevens, Robert L. Carter, Alexandra Gardiner, Amanda J. White, Andra T. Gailis, Ann Christine Iglehart, Eric B. Martin, Alison G. Monroe, Arianne Saeedi Hatton, Austin Myers, Bradley D. Patrick, Brian McMillan, Bruce R. Broadhurst, Cecil Craycraft, Charles H. Powers, Cynthia Lewis, Daniel Sibley, Danyce Jacqueline Hill, David A. Hale, Diana R. Baird, Ed Cooke, Edna Youngblood, Edward A. Burkhart, Eric Levy, Eva M. Blackwell, Evie Maderios, Frances Pinkey, Frank Lipsius, George Jones, Heather Welch, Helen Remick Jason Maderios, Jeff Shain, John Gardiner, John Vincent Sirera, Jonathon Szumny, Kay DaSilva, Kevin A. Johnson, Heather Welch, Kathy Dalton, Laura Hagopian, Lee Katherine Stanford, Les Friedrich, Loretta L. Rankin, Louis F. Larsen, Marc DeFeo, Mark E. Merin, Mark Moussa, Merilyn Fogel, Mitchell Eisenberg,

Nicholas Melisiotis, Norbert Lindenberg, Patricia Floyd, Patrick Essen, Patrick H. Yanke, R. Neil Russell, Randall David Burr, Raymond Chick, Richard Westlund, Robert C. Lahiere, Jr., Robin C. Broadhurst, Rose De Martino, Russell E. Bitzer, Shawna Kirk, Sigrid Johnson, Thomas Ross, Vincent P. Norpel, Walter G. Alspaugh, Alexander Lillo, Jenette Cupone, F.R. Horton, Judy Horton, Holly Hedgepeth, Jean Radtke, John F. Beauchemin, Keith Kanady, Letchas S. Caster, Marilyn Testa–Smith, Kris Shields, Sandra S. Beauchemin, Stephanie Snyder, Dylan Gill, Daniel V. Greechan, David F. Jones, Earl Smith, John W. Nilon, Katherine Butler, Nicholas Bentivegna, Penny S. Crampton, Robyn Bonnett, Timothy L. Burke, Virginia K. Matthews, Michael E. Gardiner, Elaine S. Gardiner, and the Attorney General for the State of Texas.

**41.** Objection letter of Randy L. Warren.

**42.** Objection letter of Nicholas Bentivegna.

ments, courts have held that "full compensation is not a prerequisite for a fair settlement." *Careccio v. BMW of N. Am. LLC,* Civ. No. 08–2619, 2010 WL 1752347, at *6 (D.N.J. Apr. 29, 2010). Moreover, "complaining that the settlement should be 'better' ... is not a valid objection." *Browning v. Yahoo! Inc.,* Civ. No. 04–1463, 2007 WL 4105971, at *5 (N.D.Cal. Nov. 16, 2007). In this case, an examination of the monetary and non-monetary compensation that the settlement provides shows that the compromise benefitted a significant number of individuals. The actual benefit received depends on the frequency of problems the particular type of vehicle sustained and, thus, results in different tiers of relief. As the Hon. Katharine S. Hayden eloquently observed, "fashioning relief this way, lines inevitably are drawn. At the end of the day, the appropriate test [of] the adequacy of the settlement terms is whether they are 'fair and reasonable.'" *Careccio,* 2010 WL 1752347, at *6. In this case, the vehicles received different benefits under the settlement based upon the frequency each specific type of vehicle sustained water damage.[43] (*Dewey,* Docket Entry No. 197 Attach. 10 at 6–7.) Thus, the parties presented a reasoned basis to provide varying benefits, including monetary reimbursement for only certain class members. In the event that the settlement fund is not exhausted by reimbursements, the remaining funds can be used to pay for repairs on vehicles no longer under warranty on a case-by-case basis before being donated to charity. (*See Dewey,* Docket Entry No. 163 Attach. 2 ¶ 25(2).)

Additionally, assertions that the settlement agreement does not address future damage caused by water ingress are incorrect. Section 6.1 of the Settlement Agreement provides five years of funding for VW's "goodwill" program to specifically cover future water damage claims. (*Dewey,* Docket Entry No. 173 Attach. 1 ¶ 6.1; *Dewey,* Docket Entry No. 213 Attach. 3 at 27.) Finally, and most significantly for these objectors, all class members may opt out of the settlement and pursue their claims individually against the defendants and seek compensation they contend the settlement does not provide. Thus, since these objectors retain this right to opt out, the settlement is fair to them too.

## 5. Division of the Class into Subclasses Creates Conflicts of Interest and Disparate Remedies

Several objectors asserted that the division of class members into subclasses produced conflicts of interest which led to inequitable remedies.[44] These divisions and the resulting remedies are based on objective criteria, namely the past frequency of failure and the design of the vehicles. (*Dewey,* Docket Entry No. 221 at 3–4.) This is a reasonable basis to decide the relief to be provided, particularly where complete, individualized relief for each class member could not be negotiated. All class members, even those in the subclass that receives only preventative care information, receive something of value. Thus, the division of class members into subclasses receiving different benefits based upon the type of vehicle they own does not

---

**43.** According to Exhibits D–1 and D–2 offered at the Fairness Hearing, .29% of the vehicle models that are receiving only maintenance information experienced water damage and only .99% of the vehicle models that are receiving service action benefits experienced water damage. (*See also Dewey,* Docket Entry No. 197 Attach. 10 at 6.) Thus, the subclasses of vehicles receiving more than just maintenance information had more than

three times the frequency of water damage compared to vehicles receiving just maintenance information, which demonstrates a need for greater relief than the other subclasses.

**44.** Objectors who raised these concerns include Joshua West, Lester Brickman, Darren McKinney, and Michael Sullivan.

.

necessarily render the settlement unfair or unreasonable, nor does it show a conflict of interest that renders the class representatives unable to adequately represent the class.

### 6. Notice of Settlement Inadequate

Fourteen class members objected to the adequacy of the notice provided to the class.[45] Specifically, these class members claim that: (1) they did not receive a plain-language notice informing them of their rights to make claims for reimbursement;[46] (2) they did not have a reasonable opportunity to review the entire settlement agreement before objecting to it in violation of Fed.R.Civ.P. 23(h)(2);[47] (3) they did not have sufficient time to respond to the motion for award of counsel fees in violation of Local Rule 7.1(d)(2);[48] (4) they were not informed of the basis for counsel's fee request or the date by which class counsel would file their application for attorneys' fees in violation of Fed.R.Civ.P. 23(h);[49] (5) they were not provided with a link to counsel's fee application on the settlement website in violation of Fed.R.Civ.P. 23(h);[50] (6) the notice provided was not the best notice practicable under the circumstances in light of the fact that cars have been resold;[51] and (7) the notice failed to inform class members that they could be excluded from reimbursement and have their recovery rights terminated even if they suffered water damage.[52]

None of these concerns warrant rejection of the settlement. First, the settlement and notice explained how to object, opt out, and make a claim. (*Dewey*, Docket Entry No. 173–1 at 27, 30–32.) The clarity of the notice is reflected in the language used and the number of putative class members who responded through 203 objections, 1,119 requests for exclusions, 14,918 claims, 1,961 emails, website inquiries from 19,891 unique visitors, and 18,137 telephone inquiries, which totaled more than 55,000 contacts. (*Dewey*, Docket Entry No. 241 ¶¶ 5–6, 8–10.) Second, the notice included a telephone number and the names of counsel to whom questions could be posed or from whom additional information could be secured. Thus, the absence of a direct link to a brief does not mean the class lacked access to the information. Third, mindful that the fee issue was in dispute, the Court issued an order available to all class members and parties that required the plaintiffs to file their fee petition on June 9, 2010, more than six weeks before the July 26, 2010 Fairness Hearing, and set a deadline for filing opposition of June 29, 2010, which superseded L. Civ. R. 7.1(d)(2) and which provided sufficient opportunity for review of the

---

45. The fourteen objectors who raised concerns regarding notice include Jean Plunk, Joshua West, Darren McKinney, Lester Brickman, Michael Sullivan, Randy L. Warren, Orion Antique Importer, Inc., David Stevens, James E. Pentz, David T. Murray, Jennifer B. Murray, Paul M. Kaufman, Sally J. van Haitsma, and Tara Castaldo.

46. Objectors who raise these concerns include Joshua West, Lester Brickman, Darren McKinney, and Michael Sullivan.

47. Objectors who raise these concerns include Tara Castaldo, Sally J. van Haitsma, and Jean Plunk.

48. The objector who raised this concern is Paul M. Kaufman.

49. Objectors who raise these concerns include David T. Murray, Jennifer B. Murray, and James E. Pentz.

50. Objectors who raise these concerns include David T. Murray, Jennifer B. Murray, and James E. Pentz.

51. Objectors who raise these concerns include David Stevens and Orion Antique Importer, Inc.

52. The objector who raised this concern is Randy L. Warren.

motion. (*Dewey*, Docket Entry No. 185.) Fourth, the class members had at least 39 days to file objections and 79 days notice of the final approval hearing, which are time frames viewed as adequate. *Weiss*, 899 F.Supp. at 1302. The record shows that the objectors clearly had an opportunity to provide their views and, indeed, many objectors specifically included arguments that responded to the plaintiffs' fee motion.[53] For these reasons, none of these complaints requires rejection of the settlement.

### 7. Filing an Objection is Too Onerous

One objector contested the procedure by which objections are made, proposing an online system in its place.[54] He found it onerous to class members, advantageous to class counsel, and reflective of a "biased system" that he was required to "spend an hour to write [his] objections on paper, print it out, place stamps on four envelops [sic], . . . and mail [his] response via snail mail."[55] While alternative methods for asserting objections may exist, the method used to field class members' objections still satisfies Rule 23(e)(5). *See Lonardo v. Travelers Indem. Co.*, 706 F.Supp.2d 766, 783–84 (N.D.Ohio 2010) (approving a class settlement while acknowledging the possibility that "the paucity of objections is at least partially due to the procedures for submitting a claim and asserting an objection"). Rule 23(e)(5) only requires that "[any] class member may object." The sheer number of objections here shows that the objectors exercised their preroga-

tive to present their objections. The Court received over 200 handwritten, typed, and electronically filed objections. In addition, the claims administrator received more than 1,000 requests for exclusion. Thus, more than one thousand putative class members communicated their positions without impediment and this volume undermines the sole complaint that the objection process was onerous. Moreover, requiring "snail mail" submissions ensured that all came from an individual authorized to communicate a view and ensured that those without computers or email were able to participate. Thus, the objection to the method used to make objections is overruled.

### 8. Requirements for Filing a Claim are Too Onerous

Seven class members objected to the requirements for submitting a claim.[56] Most of these class members argue that the documentary evidence needed to file a claim, particularly repair receipts, is too burdensome in light of the fact that many class members made repairs without expecting to receive reimbursement.[57] Another objects to the use of claims forms at all.[58] Despite the objectors' assertion that the filing system is "calculated to discourage class members from making claims," these objections are without merit.[59] First, the objectors are mistaken about the evidence needed to file a claim, as receipts are not required for claimants who sign and submit a declaration stating that a

---

**53.** Objectors who raise these concerns include: Joshua West, Lester Brickman, Darren McKinney, Paul Kaufman, and John Pentz.

**54.** The objector who challenged the procedure for making objections is John Waldeisen.

**55.** Objection letter of John Waldeisen.

**56.** The seven class members objecting to the claim submission requirements are: George Jones, Joanna B. Strauss, Loretta Rankin,

Stephen R. Marsh, Daniel C. Hauck, J.M. Cooper, and Thomas Ross.

**57.** Objectors who raised these concerns include George Jones, Joanna B. Strauss, and Loretta Rankin.

**58.** Objection letter of J.M. Cooper.

**59.** Objection letters of Thomas Ross and Stephen R. Marsh.

reimbursable repair was made and that the claimant paid for it. (*Dewey*, Docket Entry No. 173 ¶ 1.21.) Second, class members have been given ample opportunity to opt out of the settlement and pursue their claims individually. Thus, the objections to the claims process do not provide a basis to find that the settlement is unreasonable or unfair.

### 9. Reversion of Uncashed Settlement Checks

■■■ The Attorney General for the State of Texas objects to the term of the settlement agreement that terminates the defendants' obligation to make payment to a class member if the class member fails to cash their reimbursement check within 120 days. The State of Texas argues that, under Texas unclaimed property law, settlement checks that are not cashed should be turned over to the Texas Comptroller who would hold the property in trust and take affirmative action to locate the rightful owner. See Tex. Prop.Code Ann. §§ 72.101(a), 74.101 (2010).

In this case, however, the distribution of unclaimed settlement funds is governed by Rule 23, not Texas state law. *In re Lease Oil Antitrust Litig. (No. II)*, MDL No. 1206, 2009 WL 5195977, at *5 (S.D.Tex. Dec. 22, 2009) (holding that application of federal law was proper in governing distribution of unclaimed class action settlement funds given that Rule 23 and the Texas Unclaimed Property Statute are in direct conflict and that, even if the statutes did not conflict, application of federal law over the unclaimed settlement funds would not "disserve the so-called 'twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws' "). Therefore, Rule 23

governs and this Court need not withhold approval of this class action settlement based on the Texas Unclaimed Property Statute.

### 10. Ethical Obligations of Class Counsel

During the Fairness Hearing, two objectors [60] repeated their objections to the fee request. One of the objectors claimed that the settlement here and the negotiations concerning the fee award present an ethical concern that is a matter of "first impression." Another objector asserted that the settlement reflected collusion. Neither of these comments supports rejecting the proposed settlement. First, the Court of Appeals for the Third Circuit has spoken about the ethical obligations of class counsel, *In re Cmty. Bank of N. Va.*, 418 F.3d at 318–20; *In re Gen. Motors.*, 55 F.3d at 801–04 (3d Cir.1995), and this Court has sought to discharge its fiduciary obligation mindful of the observations in those opinions. To this end, the Court ensured that the class received information about the fees that the plaintiffs' counsel intended to request and required filings on this topic in advance of the deadline to file objections and more than one month before the Fairness Hearing.

Second, there is no evidence of collusion. Indeed, the opposite is indicated. Although the defendants agreed to pay the plaintiffs' attorneys' fees and expenses, they have vigorously opposed the fees and expenses sought before, during, and after the Fairness Hearing,[61] objected to the method that the plaintiffs have used to calculate the fees, the hourly rates the plaintiffs claim, and the amount of fees requested. The vigor of the defendants'

---

**60.** The objectors who made these oral arguments are counsel for Joshua West, Darren McKinney, Lester Brickman, and Michael Sullivan and counsel for objector David Sacks.

**61.** The day after the Fairness Hearing, the defendants filed yet another submission opposing the plaintiffs' fee request. (*Dewey*, Docket Entry No. 246.)

opposition is consistent with the arms-length manner in which the parties have dealt throughout their case. The parties reported a settlement to the Court after more than two years of hard fought litigation, depositions of more than fifty witnesses, and production of 200,000 pages of documents. Unlike cases where a "quick" settlement has raised a judicial eyebrow, this case was two weeks away from the close of fact discovery at the time the settlement was reported. Moreover, the settlement took more than six months to finalize and the issue of attorneys' fees was not discussed until the settlement terms for the benefit of the class were reached and continue to be hotly contested. Thus, the Circuit's concerns about concurrent discussions of fees and the settlement are not present here. See In re Gen. Motors, 55 F.3d at 804.

Furthermore, for the reasons set forth herein, the settlement reached is reasonable and there is nothing to show that the attorneys compromised the interests of the class to only further their own economic interests. For all these reasons, none of the objections "presented sufficient basis for this Court to reject or modify the Settlement presently before the Court." McCoy v. Health Net, Inc., 569 F.Supp.2d 448, 475 (D.N.J.2008) (approving settlement over nine objections raised by well over two million class members).

Given the method by which notice was provided, the fact that less than 1% of the class filed objections, and no objections warrant a finding that the settlement is unreasonable, the Court can infer that the supermajority of the class supports the settlement.

### iii. The Stage of the Proceedings and the Amount of Discovery Completed

Under the third *Girsh* factor, the Court must consider the stage of the proceedings and the amount of discovery completed.

This factor "captures the degree of case development that class counsel have accomplished prior to settlement." *In re Cendant*, 264 F.3d at 235 (quoting *In re Gen. Motors*, 55 F.3d at 813). This factor allows courts to "determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Gen. Motors*, 55 F.3d at 813.

■ Here, a nearly one-year investigation preceded the actual filing of the lawsuits. After the lawsuits were filed, the parties engaged in significant motion practice, protracted and contentious discovery, which included more than fifty depositions throughout the United States, the exchange of thousands of documents, some of which were in a foreign language, and consultation with numerous automotive experts. (*Dewey*, Docket Entry No. 163 Attach. 13 ¶ 3; *Delguercio*, Docket Entry No. 121 Attach. 13 ¶ 3; *Dewey*, Docket Entry No. 163 Attach. 2 ¶¶ 16–18; *Delguercio*, Docket Entry No. 121 Attach. 2 ¶¶ 16–18; *Dewey*, Docket Entry No. 196 Attach. 1 ¶ 7.) In addition, more than two years of discovery produced more than 30,000 paid warranty claims and thousands of internal customer care records together with technical vehicle information and hundreds of schematics written in German. (*Dewey*, Docket Entry No. 196 Attach. 1 ¶ 7; *Dewey*, Docket Entry No. 197 Attach. ¶¶ 65–68.) At the time the parties reported that they had reached a settlement, fact discovery was set to conclude in approximately two weeks and the parties were about to commence disclosure of expert reports. (*Dewey*, Docket Entry No. 149 at 4; *Dewey*, Docket Entry No. 163 Attach. 2 ¶ 20; *Delguercio*, Docket Entry No. 121 Attach. 2 ¶ 20.)

Given the information they gathered, class counsel clearly possessed sufficient information to assess the factual and legal strengths and weaknesses of their case,

engage in arms-length negotiations, and secure confirmatory discovery to reach this agreement. The settlement here reflects the result of their assessment of the facts and law critical to evaluating the case. *See Klingensmith v. Max & Erma's Rests., Inc.,* Civ. No. 07–318, 2007 WL 3118505, at *4 (W.D.Pa. Oct. 23, 2007). Therefore, this factor weighs in favor of approving the settlement.

### iv & v. The Risks of Establishing Liability and Damages

■ The fourth and fifth factors require the Court to consider the risk of establishing both liability and damages. These factors "survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *In re Prudential,* 148 F.3d at 319. Stated differently:

> if it appears that further litigation would realistically risk dismissal of the case on summary judgment or an unsuccessful trial verdict, it is in the plaintiffs' interests to settle at a relatively early stage. In contrast, if it appears that liability is extraordinarily strong, and it is highly likely that plaintiffs would prevail at trial, settlement might be less prudent. On this issue, the court should avoid conducting a mini-trial and must to a certain extent, give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action.

*In re Ikon II,* 209 F.R.D. at 105–06 (quoting *Lachance v. Harrington,* 965 F.Supp. 630, 638 (E.D.Pa.1997)) (internal quotation marks omitted).

■ In the present case, class counsel recognizes the challenge in establishing that New Jersey law should be applied to the claims of class members from states other than New Jersey. (*Dewey,* Docket Entry No. 213 Attach. 3 at 12.) These challenges have existed both before and since the enactment of CAFA for plaintiffs who file nationwide class actions based upon state law claims that may require application of the law of the homestate of a particular class member that may differ from the law of the forum. *See Chin v. Chrysler Corp.,* 182 F.R.D. 448, 454–55 (D.N.J.1998). For example, some state laws require proof of contractual privity to bring an implied warranty claim or proof of reliance to prove a fraud claim while others do not. *Id.* at 460. Similarly, the elements of an unjust enrichment claim vary among the states. *See Sullivan,* 613 F.3d at 150–51. In addition, at the Fairness Hearing, the plaintiffs conceded that certain states' consumer protection laws do not include a private right of action. (Fairness Hearing.) These differences could defeat class certification on such claims entirely or only permit certification on certain issues. *See id.,* at 158. Moreover, counsel also acknowledges that statute of limitations and limitations in the warranties may limit the ability of certain class members to recover. Furthermore, much of the relief sought is not easily or simply quantified.

Counsel also acknowledges that making claims based upon "a variety of defects in the 8 different automobile models built on at least 20 different platforms, [over 12 model years,] corresponding to over 100 vehicle variations, manufactured by 2 different entities," presents factual differences that may have made it difficult to secure a nationwide, multi-model, multi-year, multi-manufacturer class in the face of challenges to commonality and predominance. (*Dewey,* Docket Entry No. 213 Attach. 3 at 12, 15.). Moreover, there could be challenges to "[p]roving a class-wide defect where the majority of class members have not experienced any prob-

lems with the alleged defective product." *Chin,* 182 F.R.D. at 455. At a minimum, this reality could require the creation of a series of subclasses or it may present a very real risk of the class not being certified at all.

Finally, even if the class were certified and succeeded at trial, class counsel astutely recognize that the defendants would likely appeal. All of these considerations may affect the chance of establishing liability, damages, or finality of the dispute, whereas the settlement guarantees recovery and a final disposition of the case. In light of these challenges, class counsel's analysis of the risks deserves some credence, *see In re Ikon II,* 209 F.R.D. at 108, and the balance of the costs of continued litigation against the benefits of settlement for each party weighs in favor of approving the settlement.

### vi. The Risks of Maintaining the Class Action Through the Trial

Sixth, the Court must consider the risk of maintaining the class action through the trial. Courts in the Third Circuit previously approached this factor with the understanding that "[t]he value of a class action depends largely on the certification of the class because, not only does the aggregation of the claims enlarge the value of the suit, but often the combination of the individual cases also pools litigation resources and may facilitate proof on the merits." *In re Gen. Motors,* 55 F.3d at 817. As a result, "the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the action." *Id.* Therefore, "this factor measures the likelihood of obtaining and keeping a class certifi[ed] if the action were to proceed to trial." *In re Warfarin,* 391 F.3d at 537.

Based upon the facts of this case, and for the reasons just recited, there is no guarantee that the class would be or

would remain certified throughout future litigation. Although each member of the class could have the same complaint against the defendants, namely that their vehicles' sunroofs leaked, the defendants argue that continued litigation may reveal divergent interests, such as between vehicles that have sustained no problem and those that were damaged, *see Hubbard v. Gen. Motors Corp.,* Civ. No. 95–4362, 1996 WL 274018, at *9 (S.D.N.Y. May 22, 1996) (noting that a vehicle that never exhibits the alleged defect is fit and hence cannot provide a basis for a breach of warranty claim), and that differences in the design of the drains on the different vehicle models may make a finding of commonality difficult. (*Dewey,* Docket Entry No. 217 at 2, 8–9, 12.) In addition, as stated above, there may be challenges arguing that New Jersey state law should govern the claims of non-New Jersey plaintiffs and that differences in the applicable law may make it impossible to maintain a nationwide class on every claim. *See Sullivan,* 613 F.3d at 145–46. Because "[a] district court retains the authority to decertify or modify a class at any time during the litigation if it proves to be unmanageable," *In re Warfarin,* 391 F.3d at 537 (citing *In re Prudential,* 148 F.3d at 321), the specter of decertification makes settlement an appealing alternative. As class certification is not a certainty and there is no guarantee that the certified class would be maintained throughout trial or on appeal, this factor weighs in favor of approving the settlement.

### vii. The Ability of the Defendants to Withstand a Greater Judgment

The seventh factor for the Court's consideration, namely, the ability of the defendant to withstand a greater judgment, has been problematic for other courts within the Circuit to analyze. *See, e.g., In re Prudential,* 148 F.3d at 322 (noting it is

"difficult to determine [the value of the proposed settlement] because both the compensatory relief available under the [alternative dispute processes] and the additional relief available through Basic Claim Relief are uncapped"). Regardless, the Court of Appeals has found that a defendant's ability to pay a larger settlement sum is not particularly damaging to the settlement agreement's fairness as long as the other factors favor settlement. *See id.* at 321–22; *McGee,* 2009 WL 539893, at *6 (noting that withholding approval because the defendant could withstand a greater judgment makes "little sense" where defendant is paying a large settlement and class counsel's fees and expenses).

■ In the present case, there is nothing before the Court that suggests that the defendants would be unable to withstand a judgment greater than the relief that will be provided under the settlement. This factor, therefore, does not dictate that a settlement is necessary to ensure that the plaintiffs obtain relief for their alleged injuries.

### viii & ix. The Range of the Reasonableness of the Settlement Fund in Light of Both the Best Possible Recovery & All the Attendant Risks of Litigation

■ Finally, the Court must consider the range of the reasonableness of the settlement in light of both the best possible recovery and the attendant risks of litigation. These factors are used to "evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case." *In re Warfarin,* 391 F.3d at 538. In assessing this factor, the Court should determine "whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *In re Prudential,* 148 F.3d at 322.

■ Although the plaintiffs' economic expert valued the settlement at approximately $142 million, (*Dewey,* Docket Entry No. 197 Attach. 10 at 20), class counsel has asked the Court to find that the settlement has a value of $90 million. (*Dewey,* Docket Entry No. 238.) For the reasons explained later in this Opinion, the Court finds both figures to be inflated. Nonetheless, there is no doubt that the settlement provides real and valuable relief to the class members. It requires the defendants to provide service for nearly 3 million vehicles with the highest failure rates as well as maintenance information to prevent clogs. (*Dewey,* Docket Entry No. 213 Attach. 4 ¶ 6.) In addition, it provides an $8 million fund to reimburse certain class members who incurred expenses repairing the drain problem and cleaning the interior of certain vehicles that sustained water damage. (*Dewey,* Docket Entry No. 213 Attach. 3 at 32; *Dewey,* Docket Entry No. 213 Attach. 4 ¶ 6.) Although a victory at trial may have resulted in modification or service actions for all vehicles, which the plaintiffs assert is worth more than $77 million, and reimbursement for the costs of all repairs and clean-up due to water damage each class member sustained, (*Dewey,* Docket Entry No. 213 Attach. 4 ¶ 8), the proposed settlement achieves a great deal of relief sooner than would be received had the class succeeded on all claims at trial and is fair to the class even though it does not provide full compensation. *See Careccio,* 2010 WL 1752347, at *6 (noting that "full compensation is not a prerequisite for a fair settlement"); *McGee,* 2009 WL 539893, at *6–7 (approving a class settlement considering the risks faced, the immediate benefits provided, and the absence of a guaranteed favorable verdict even though it does not provide full recovery). Indeed, given the likelihood of an appeal of the class certification ruling or trial verdict, many of the cars may suffer damage

and their owners or lessees could go without relief for many years. When the certainty of recovery received is weighed against the attendant risks and time involved of taking this case to trial, the proposed settlement appears more than reasonable. *See Varacallo*, 226 F.R.D. at 240 (finding the settlement "yields substantial and immediate benefits, and it is reasonable in light of the best possible recovery and the attendant risks of litigation—little or no recovery at all"). Therefore, this factor weighs in favor of approving the settlement.

Moreover, the criticisms about the attorneys' fees sought do not render the settlement unfair. First, both sides represent that the issue of attorneys' fees was not discussed until after the terms of the settlement were agreed upon. (*Dewey*, Docket Entry No. 213 Attach. 4 ¶ 3; *Dewey*, Docket No. 217 at 16.) Second, the amount of the fees will not reduce the benefits to the class. Although the value of the settlement to the class will be considered to determine the amount of the fee award, and although the money for the fees will come from the same source as the benefits to the class, the amount of the fees awarded has no impact on the cash and non-cash compensation to the class. Third, the defendants vigorously object to the fee award that the plaintiffs' counsel seek. The defendants' strong opposition to counsel's $22.5 million fee request shows that this is not a situation where the plaintiffs negotiated a settlement that was not favorable to the class in exchange for "red-carpet treatment" in their request for fees. *In re Gen. Motors*, 55 F.3d at 820. Thus, objections to or disagreements about the fee award sought do not render the settlement unfair as it appears that the settlement itself has been negotiated at arm's length by class counsel on behalf of the settlement class. Class counsel educated themselves about the facts and law sufficiently to evaluate the strengths, weaknesses, and the goals of the case. Further, the class representatives have acted independently and their interests are identical to the interests of the class members. Moreover, had the settlement of the class's claims not been achieved, all of the parties faced the expense, risk, and uncertainty of extended litigation.

Based upon the foregoing, and upon consideration of the submissions, record of proceedings, arguments, and representations of counsel, the Court finds that the proposed settlement of this class action is fair, reasonable, and adequate and the Court grants the plaintiffs' motion for final approval of the settlement.

The Court now turns to the motion for fees and expenses for class counsel.

### E. *Attorneys' Fees and Costs*

■ Courts must thoroughly analyze an application for attorneys' fees in a class action settlement. *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 299 (3d Cir.2005) ("*In re Rite Aid*"); *Yong Soon Oh v. AT & T Corp.*, 225 F.R.D. 142, 146 (D.N.J. 2004); Fed.R.Civ.P. 23(h). This is so even where the parties have consented to the proposed attorneys' fees, *Yong Soon Oh*, 225 F.R.D. at 146; *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 128 (D.N.J. 2002), because of the risk that the "lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for [as stated previously] red-carpet treatment for fees." *In re Gen. Motors*, 55 F.3d at 820.

#### i. Choice of Law

■ The Court must first determine what law governs the application for fees. Under the so-called American Rule for attorneys' fees, "[t]here can be no recovery for counsel fees from the adverse party to a cause, in the absence of express statutory allowance of the same, or clear agreement by the parties, or some other

established exception," such as in cases involving trusts. *Dardovitch v. Haltzman,* 190 F.3d 125, 145 (3d Cir.1999) (quoting *First State Underwriters Agency of New England Reins. Corp. v. Travelers Ins. Co.,* 803 F.2d 1308, 1318 (3d Cir.1986)). If the award occurs based upon an application of state law, rather than an agreement of the parties, then the *Erie* doctrine demands that state law governs the method of determining attorneys' fees, absent a conflicting rule of procedure. *See Abrams v. Lightolier, Inc.,* 50 F.3d 1204, 1223–24 (3d Cir.1995); *Sec. Mut. Life Ins. Co. of N.Y. v. Contemporary Real Estate Assocs.,* 979 F.2d 329, 332 (3d Cir.1992); *Buse v. Vanguard Group of Inv. Cos.,* Civ. No. 91–3560, 1998 WL 54397, at *2 (E.D.Pa. Jan. 30, 1998). Thus, state law applies where statutory fee shifting is the basis upon which fees are being awarded. *See Abrams,* 50 F.3d at 1223. If, however, the fee award has occurred as a result of the parties' private agreement in a federal class action settlement, no fee shifting occurs.[62] *In re Diet Drugs,* 582 F.3d 524,

---

**62.** During the Fairness Hearing, the defendants argued that the plaintiffs are "prevailing parties" under the CFA and that the payment of attorneys' fees is occurring pursuant to the fee shifting provisions of N.J.S.A. 56:8–19, and not based upon the settlement agreement that obligated the defendants to pay the plaintiffs' fees and expenses. The defendants' argument is without merit. First, as the plaintiffs observe, the defendants' argument ignores the fact that they agreed to pay fees and expenses. (*Dewey,* Docket Entry No. 249.) Second, as set forth in the text, binding appellate caselaw does not view a voluntary payment of fees as a result of a class action settlement to be a payment as a result of statutory fee shift. If it did, then all appellate cases would review the award of fees in class action settlement cases with fee-shifting claims only under the lodestar method. A review of the binding caselaw shows that this is not the Circuit's view. Third, there is a question as to whether the plaintiffs here are "prevailing parties" under the CFA.

Section 56:8–19 of the CFA requires a court to "award reasonable costs of suit" to the prevailing party. *See also New Jerseyans for Death Penalty Moratorium v. N.J. Dep't of Corrections,* 185 N.J. 137, 152, 883 A.2d 329 (2005) (observing that the CFA awards fees to the prevailing party). Federal courts addressing fee awards under the CFA look to federal civil rights cases for guidance. *Vukovich v. Haifa, Inc.,* Civ. No. 03–737, 2007 WL 2596547, at *2 (D.N.J. Sept. 5, 2007) (citations omitted). To be deemed a "prevailing party" under § 1988, the "party must achieve a *court-ordered* change in the legal relationship between the plaintiff and the defendant." *People Against Police Violence v. City of Pittsburgh,* 520 F.3d 226, 232 (3d Cir.2008) (em-

phasis added and internal quotation marks omitted). A party "does not become a 'prevailing party' solely because his lawsuit causes a voluntary change in the defendant's conduct." *Id.* As the Hon. Dickinson R. Debevoise observed, "[i]n such a situation, the change in legal relationships lacks the requisite judicial imprimatur of a court-ordered change." *Singer Mgmt. Consultants, Inc. v. Milgram,* 608 F.Supp.2d 607 (D.N.J.2009) (internal citations and quotation marks omitted). Because no court-ordered change in the legal relationship between the parties has occurred here, there is no "prevailing party" as that term is defined in § 1988 and, therefore, no fee shift under the CFA. While there are some circumstances in which a party may be deemed a "prevailing party" in a dispute resolved via settlement agreement that can be enforced through a consent order, *see, e.g., Buckhannon Bd. & Care Home, Inc. v. W.Va. Dep't of Health & Human Res.,* 532 U.S. 598, 603–04, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001); *H.I.P. (Heightened Indep. & Progress, Inc.) v. K. Hovnanian at Mahwah VI, Inc.,* 291 N.J.Super. 144, 154, 676 A.2d 1166 (L.Div. 1996), this case does not involve such a situation as there is no judicially ordered material alteration in the parties' legal relationship. The change in the relationship between the parties here occurred by virtue of a contract they voluntarily entered. Moreover, the case here is not settled by way of a consent decree. *Buckhannon Bd. & Care Home, Inc.,* 532 U.S. at 604 n. 7, 121 S.Ct. 1835. Rather, the Court's Final Order will only dismiss claims, approve a settlement, limit its use, and state that the Court retains jurisdiction to enforce the terms of the settlement. The latter simply means that the parties will not need to institute a separate contract action if a party

540 (3d Cir.2009). In such a case, federal law, rather than state law, governs the decision concerning fees and costs. *See, e.g., McGee,* 2009 WL 539893, at *13 (applying federal law to a fee award in a CAFA settlement of claims under, among other things, the CFA); *Briggs v. Hartford Fin. Servs. Group, Inc.,* Civ. No. 07–5190, 2009 WL 2370061, at *14, 15 n. 92 (E.D.Pa. July 31, 2009) (applying federal case law to decide class counsel's fee request in a CAFA case based upon state law and reminding counsel that federal law governs applications filed in federal class action cases); *First State Orthopaedics v. Concentra, Inc.,* 534 F.Supp.2d 500, 523–24 (E.D.Pa.2007). Thus, federal law will be used to decide the fee and cost application.[63]

The fact that the parties agreed that New Jersey law governs the settlement agreement does not change the result. First, this choice of law provision appears only in the settlement agreement. Second, there is nothing in the settlement agreement about attorneys' fees other than an agreement that "class counsel fees and expenses shall be paid entirely and exclusively by the defendants" within thirty days of the entry of judgment and the amount paid "shall not diminish, invade or

reduce or be derived or drawn from the Reimbursement Fund." (*Dewey,* Docket Entry No. 174 Attach. 1 at 36 ¶¶ 15.2–15.3.) As the defendants observe in their brief in opposition to the fee award, "there is no agreement concerning the amount of attorney fees to be paid or the method of computation." (*Dewey,* Docket Entry No. 219 at 6.) Third, according to all parties, the settlement agreement was signed before there were any discussions about the amount of fees or expenses the plaintiffs would seek. (*Dewey,* Docket Entry No. 213 Attach. 4 ¶ 3; *Dewey,* Docket Entry No. 217 at 16.) Thus, the choice of law clause could not be used to cover a topic that was not discussed as part of the settlement itself.[64] For all of these reasons, the choice of law provision in the settlement agreement has no bearing on the law that applies to determining the amount of fees and costs.

## ii. Choice of Methods

Under federal class action caselaw, to determine appropriate attorneys' fees, courts generally apply either the lodestar method or the percentage-of-recovery method. *In re Rite Aid,* 396 F.3d at 300; *Yong Soon Oh,* 225 F.R.D. at 146. Even

breaches the settlement agreement. As a result, the Court declines to find that this case has any "prevailing party" under the CFA and, thus, no court-ordered fee shift will occur. Rather, the only basis upon which the Court has deviated from the American Rule and awarded fees is the private agreement of the parties.

63. Although not a concern in this case, the Court notes that "an attorney's fee issue affecting the allocation of funds between attorney and client presented in a diversity case is a matter of procedure governed by the law of the forum." *Mitzel v. Westinghouse Elec. Corp.,* 72 F.3d 414, 416 (3d Cir.1995).

64. The defendants' citation to *Litton Ind., Inc. v. IMO, Inds., Inc.,* 200 N.J. 372, 388, 982

A.2d 420 (2009) does not warrant a different result. First, *Litton* was not a class action case filed in federal court. Rather, *Litton* was a state court breach of contract case that contained a provision that required the payment of attorneys' fees in the event that the non-breaching party expended attorneys' fees as a result of the breach. Second, the New Jersey Supreme Court found that, absent contractual terms concerning how a fee award is to be calculated, the Court's jurisprudence would govern. The governing jurisprudence in *Litton* was New Jersey state law and appropriately guided the New Jersey Court awarding fees to a prevailing party in a breach of contract action. Here, the governing jurisprudence is federal class action law and it governs this Court's analysis of the fee petition in this settled class action case.

though "the ultimate choice of methodology will rest within the ... court's sound discretion," *In re Gen. Motors,* 55 F.3d at 821, the Court of Appeals of the Third Circuit has stated that "each method has distinct advantages for certain kinds of actions, which will make one of the methods more appropriate as a primary basis for determining the fee." *Id.* at 820. Accordingly, "a court making or approving a fee award should determine what sort of action the court is adjudicating and then primarily rely on the corresponding method of awarding fees." *Id.* at 821.

■ The lodestar method is usually applied in statutory fee-shifting cases because it "reward[s] counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation." *In re Rite Aid,* 396 F.3d at 300 (quoting *In re Prudential,* 148 F.3d at 333). The fees are "de-coupled" from the class recovery which "assures counsel undertaking socially beneficial litigation ... an adequate fee irrespective of the monetary value of the final relief achieved for the class." *In re Gen. Motors,* 55 F.3d at 821. Although primarily used for statutory fee-shifting cases, "the lodestar rationale has appeal where ... the nature of the settlement evades the precise evaluation needed for the percentage of recovery method." *Id.* The lodestar method calculates fees by multiplying the hours expended by an appropriate hourly rate. *Id.* at 819 n. 37. In fee-shifting cases, an upward adjustment of the

amount is permitted in rare and exceptional circumstances.[65] *Perdue v. Kenny A.,* — U.S. ——, 130 S.Ct. 1662, 1674–75, 176 L.Ed.2d 494 (2010); *In re AT & T Corp.,* 455 F.3d at 163 n. 4.

■ The percentage-of-recovery method "awards counsel a variable percentage of the amount recovered for the class," *In re Gen. Motors,* 55 F.3d at 819 n. 38, and requires the Court "to determine a precise valuation of the settlement on which to base its award." *Id.* at 822. After the Court determines the overall value of the settlement, it must then "calculate an appropriate percentage of that fund to award in attorneys' fees based on a series of reasonableness factors that have been developed through [the Third Circuit's] jurisprudence." *In re Diet Drugs,* 582 F.3d at 536 n. 24; *see also In re Prudential,* 148 F.3d at 336–40; *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190 (3d Cir.2000). The percentage-of-recovery method is preferred in "common fund" cases. *In re Gen. Motors,* 55 F.3d at 821. In a classic common fund case, an attorney is entitled to fees and costs from a fund set aside for class members.[66] *In re Cendant,* 264 F.3d at 256. The percentage-of-recovery method is suitable for common fund cases because it permits attorneys' fees to be deducted directly from the settlement fund "in a manner that rewards counsel for success and penalizes it for failure." *In re Rite Aid,* 396 F.3d at 300 (quoting *In re Prudential,* 148 F.3d at 333). The percentage-of-recovery method also ensures that the class is not unjustly enriched by

---

65. In fee-shifting cases, "courts may not increase the lodestar amount in consideration of the attorney's contingent risk when calculating a fee." *In re AT & T Corp.,* 455 F.3d at 163 n. 4 (citations and quotation marks omitted).

66. As described by the Court of Appeals for the Third Circuit, "[t]he common fund doctrine provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees." *In re Gen. Motors,* 55 F.3d at 820 n. 39.

getting a benefit without compensating the lawyers for securing the benefit. *In re Gen. Motors*, 55 F.3d at 820 n. 39, 821. Besides classic common fund cases, the percentage-of-recovery method is also appropriate "where, although the parties claim that the fee and settlement are independent, they actually come from the same source." *Id.* at 821. The Court can apply the "common fund" principles when the fees and settlement are paid by the same source even though the fees are not actually drawn from a fund established for the class. *See id.*

In *In re Gen. Motors*, for example, the parties contended that the fee agreement and settlement fund were separate agreements and "thus superficially resembl[ed] the separate awards in statutory fee cases." *Id.* at 821. The Court of Appeals for the Third Circuit, however, determined that "private agreements to structure artificially separate fee and settlement arrangements cannot transform what is in economic reality a common fund situation into a statutory fee shifting case," *Id.* The Court concluded that the settlement was a "hybrid," which "more closely resemble[d] a common fund case" after determining that the fee was not made pursuant to a fee-shifting statute and the fund did not award the hard-to-value intangible rights that would justify using the lodestar method. *Id.* at 822.

In sum, the lodestar method generally applies to cases involving fee-shifting statutes or where the settlement "evades the precise evaluation needed for the percentage-of-recovery method." *Id.* at 821. The percentage-of-recovery method applies where there is a common fund or where the economic reality of the settlement is akin to a common fund. *Id.* at 821–22.

In *In re Diet Drugs*, the appellate court rejected the argument that the lodestar method should have been used to calculate fees in a class action settlement simply because a statutory fee-shifting claim was involved. 582 F.3d at 540. In the context of a class settlement, the Court of Appeals for the Third Circuit determined that "there [wa]s no such [fee-shifting] statute at work here. [Defendant] voluntarily undertook the process of compensating opposing counsel, by establishing and funding various escrow accounts dedicated to the payment of claimants' legal costs." *Id.* at 540. Consequently, the Court determined that the case fell under the common fund doctrine and that the percentage-of-recovery method was appropriate. Thus, *In re Diet Drugs* and *In re Gen. Motors* teach that if a class action is brought under a fee-shifting statute but is resolved through a settlement, then the fees should be calculated based upon the percentage-of-recovery method if: (1) the benefits to the class can be valued; (2) the compensation to the class and counsel come from the same source; and (3) the source has voluntarily agreed to pay class counsel's fees.

Although the Fourth Amended Complaints filed in *Dewey* and *Delguercio* contain claims under the CFA, which contains a fee-shifting provision, (*Dewey*, Docket Entry Nos. 86 ¶ 1 and 87 ¶ 84; *Delguercio*, Docket Entry No. 63 ¶ 84), for reasons stated herein, this fee-shifting statute provision is not triggered here. Like in *In re Diet Drugs* and *In re Gen. Motors*, the defendants here voluntarily agreed to pay some portion of the attorneys' fees [67] and, thus, there has been no fee-shifting as a result of a finding that the plaintiffs prevailed. Moreover, the value of the settlement is quantifiable. Furthermore, although a fee-shifting statute would control

---

**67.** The defendants ask that the Court award fees totaling $3.5 million. (*Dewey*, Docket Entry No. 174 Attach. 1 ¶ 15.2; *Dewey*, Docket Entry No. 219 at 29.)

the fee issue in this case had the plaintiffs litigated to conclusion and prevailed on the CFA claim at trial, the benefits of this settlement to the class and counsel fee are being voluntarily paid by a single source, namely, the defendants. The fact that the defendants did not agree to a precise amount as part of the settlement agreement and has disputed the amount sought does not preclude using the percentage-of-recovery method because the value of the settlement can be calculated, the defendants agreed to pay fees, and the payment of both "the fee and settlement ... come from the same source." *In re Gen. Motors,* 55 F.3d at 821.

Accordingly, the Court will apply the factors used to analyze attorneys' fee using the percentage-of-recovery method and then, in accordance with Circuit law, it will perform a crosscheck using the lodestar cross-check analysis.

### iii. Percentage–of–Recovery Analysis

The Court of Appeals for the Third Circuit has identified a non-exhaustive list of the factors for courts to consider when determining the reasonableness of attorneys' fees in a class action settlement where fees are calculated as a percentage of recovery. The factors are:

(1) the size of the fund created and the number of persons benefitted;

(2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel;

(3) the skill and efficiency of the attorneys involved;

(4) the complexity and duration of the litigation;

(5) the risk of nonpayment;

(6) the amount of time devoted to the case by the plaintiffs' counsel; and

(7) the awards in similar cases.

*In re Rite Aid,* 396 F.3d at 301; *In re AT & T Corp.,* 455 F.3d at 164–65; *Gunter,* 223 F.3d at 195 n. 1 (citing *In re Prudential,* 148 F.3d at 336–40; *In re Gen. Motors,* 55 F.3d at 819–22). The appellate court identified three other factors to consider, namely:

(1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations; (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained; and (3) any 'innovative' terms of settlement.

*In re AT & T Corp.,* 455 F.3d at 165 (citing *In re Prudential,* 148 F.3d at 338–40). Because the facts of each case are different, the factors "need not be applied in a formulaic way" and some factors may be afforded greater weight than others. *In re Rite Aid,* 396 F.3d at 301; *Gunter,* 223 F.3d at 195 n. 1.

In addition to considering these factors, courts are advised to cross-check the proposed attorneys' fees under the percentage-of-recovery method by comparing them to the amount the attorneys would have earned under the lodestar method. *In re Rite Aid,* 396 F.3d at 300; *Gunter,* 223 F.3d at 195 n. 1. The "crosscheck ... [is] a means of assessing whether the percentage-of-recovery award is too high or too low." *In re Diet Drugs,* 582 F.3d at 545 n. 42. The "crosscheck is performed by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier." *In re AT & T Corp.,* 455 F.3d at 164. This cross-check calculation does not require mathematical precision, a "full-blown lodestar inquiry," or a review of actual time sheets. *Id.* at 169 n. 6. Indeed, where there have been no objections to the lodestar calculations, a full-blown lodestar analysis is an unnecessary and inefficient use of judicial resources. *See Weber v.*

*Gov't Employees Ins. Co.,* 262 F.R.D. 431, 451 n. 10 (D.N.J.2009).

### a. The Size of the Fund and the Number of Persons Benefitted

■ The Court must first consider the size of the fund created and the number of persons benefitted. *In re Rite Aid,* 396 F.3d at 301. In cases where there is a large recovery, it is appropriate for the percentage of attorneys' fees to be smaller than the percentage would be in a case with a relatively modest recovery. *Id.* at 302. Stated differently, "as the size of a fund increases, the appropriate percentage to be awarded to counsel decreases." *Yong Soon Oh,* 225 F.R.D. at 151 (citation omitted). This principle reflects the belief that " 'in many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.' " *Id.* (quoting *In re Prudential,* 148 F.3d at 339). The "declining percentage concept," however, is a general guidepost and does not trump consideration of the other factors. *In re Rite Aid,* 396 F.3d at 303; *see also In re Cendant Derivative,* 232 F.Supp.2d at 337 (deciding not to decrease the fee percentage because a $54 million dollar award qualified as a "moderate" award and citing *In re Aetna, Inc.,* MDL No. 1219, 2001 WL 20928, at *15 (E.D.Pa. Jan. 4, 2001) which noted that an $81 million award was "smaller than the large settlements for which courts decrease the percentage awarded").

■ In this case, the number of class members includes 5.5 million present and former owners and/or lessees of about 3 million cars. (*Dewey,* Docket Entry No, 197 ¶ 94.) For reasons set forth below, the Court has found that the proposed settlement agreement provides benefits to the class valued at $69,227,430 in the form of information, services, and/or reimbursement.

### 1. Valuation of the Settlement

■ The issue of the settlement's value is relevant to two subjects: (1) the reasonableness of the settlement, *see In re Gen. Motors,* 55 F.3d at 806 (stating that the "primary touchstone of [the range of reasonableness] inquiry is the economic valuation of the proposed settlement"); and (2) the attorneys' fees request. *See Weiss,* 899 F.Supp. at 1304 (observing that "a percentage of the value of the settlement to the class is the appropriate method for calculating counsel fees"). As to the reasonableness of the settlement, the Court has already noted that while it questions the value that the plaintiffs and the value their expert have endorsed, the terms of the settlement are reasonable in light of the broad relief provided and the challenges that a full-blown litigation poses. As to the attorneys' fees, the value of the settlement must be examined so that the Court can determine the fee award. As stated previously, if the settlement's value is certain, the Court can use the percentage-of-recovery method to calculate attorneys' fees, but if the value is too uncertain, then the Court must use the lodestar method. *See Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1029 (9th Cir.1998) (using a lodestar calculation because of the difficulty in gauging the net value of a settlement involving injunctive relief); *see also Weber,* 262 F.R.D. at 450 (using percentage-of-recovery method is inappropriate because of the uncertainty involved in valuing future claims). As a result, the Court is required to critically examine the valuation that the plaintiffs advocate to determine if it is quantifiable and reliable. *See In re Gen. Motors,* 55 F.3d at 810 (criticizing the district court for "uncritically accept[ing] such high estimates of the settlement's value"). To evaluate the plaintiffs' valuation of the settlement, the Court should consider:

1. The benefit to the class and not the cost to the defendants, *O'Keefe*, 214 F.R.D. at 304;

2. The market price of the benefit, *id.* at 307 (considering market price for a warranty as a "starting point" when valuing the settlement);

3. Whether the value is based on "available data and not broad speculation," *id.*, such as an unsupported assumption that 100% of the class will take advantage of the nonmonetary portion of the settlement, *see Sylvester v. CIGNA Corp.*, 369 F.Supp.2d 34, 52 (D.Me.2005); and

4. Cash versus non-cash components of a settlement, as courts are conservative when considering the value of noncash settlement benefits, *see Acosta v. Trans Union*, 243 F.R.D. 377, 390 (C.D.Cal.2007) (quoting *In re Mexico Money Transfer Litig.*, 267 F.3d 743, 748 (7th Cir.2001) (noting that "compensation in kind is worth less than cash of the same nominal value")); *see, e.g., Frankenstein v. McCrory Corp.*, 425 F.Supp. 762, 765 (S.D.N.Y.1977) (using lowest value in range that an unchallenged expert calculated); *see, e.g., McCoy*, 569 F.Supp.2d at 478 (valuing injunctive relief at "parties' lowest estimated value").

The Court has considered each of these factors and has concluded that Dr. Eads's settlement valuation and the value that class counsel advocated are both inflated. According to his report, Dr. Eads assigned a value of $141,820,208 to the settlement. (*Dewey*, Docket Entry No. 194 Attach. 1 at 12.) The Court, however, notes several typographical and calculation errors in Dr. Eads's calculation summary.[68] (*See Dewey*, Docket Entry No. 197 Attach. 10 at 20.) Using the corrected figures for each of the components, the Court determined that Dr. Eads's valuation of the settlement should be $142,120,207. This figure is based upon Dr. Eads's appraisal of: (1) the value of the educational preventative maintenance information; (2) the reimbursement funds, totaling $9.4 million; and (3) the value of the various service actions, excluding reimbursements. For each service action, he has assigned a value to: (1) the repairs made to avoid water ingress; (2) the future damage avoided by virtue of the repairs; and (3) the future diminution of the value of the car avoided because the repairs prevent water damage that would decrease the overall value of the car. One business day before the Fairness Hearing, the parties announced that they were asking the Court to value the settlement at $90 million[69] and the plaintiffs no longer

---

**68.** In Dr. Eads's calculation summary, he incorrectly uses $28,773,444 as the value of educational preventative maintenance information. (*Dewey*, Docket Entry No. 197 Attach. 10 at 20.) The value that he had previously calculated is $28,733,445. (*Id.* at 16.) He also makes a typographical error by assigning $1,340,632 to the value of "[a]dditional reimbursements to owners/lessees of MY97–06 Audi A4 (B5, B6) and MY98–05 Audi A6 (C5) (including Cabrio, S, and RS versions)" when the intended figure is $1,340,632. (*Id.* at 20.) Finally, Dr. Eads miscalculates the total when adding up the settlement elements. (*Id.*) Using the values he lists, he calculates a total of $141,820,208

while he should have arrived at a total of $142,160,207. (*Id.*) Overall, his calculation errors lead to an understatement of his settlement value of $339,999.

**69.** At the Fairness Hearing, the plaintiffs also announced that they were leaving to the Court's discretion whether the value of the settlement should include the claims administration expenses that the defendants are paying. The Court declines to include this amount because the claims administrator provided a means for counsel to fulfill its duty to the class but did not provide a direct benefit to the class and it would not have been an expense that the class members would incur because of the drain problems. *See Schwartz*

wanted the Court to consider the value attributed to the future diminution of value avoided. Because the plaintiffs declined to withdraw this portion of Dr. Eads's report, the Court will examine whether this part of his valuation reflects any benefit to the class.

In assessing the value for each component, Dr. Eads separated the class vehicles into seven subclasses based on the design characteristics and benefits each vehicle is eligible to receive under the settlement.[70] (*Id.* at 2.) He then calculated the value of each component of the settlement that each subclass is eligible to receive.

### A. Value of the educational preventative maintenance information

To calculate the value of the educational preventative maintenance information, Dr. Eads considered: (1) the future repair cost avoided; and (2) the future diminution of value avoided as a result of the informa-

tional materials. (*Id.* at 16.) Dr. Eads only considered subclasses 4, 5, 6, and 7 because he believed that only these subclasses would receive additional value from this information. (*Id.* at 15.)

To calculate the future repair cost avoided,[71] Dr. Eads first estimated the number of vehicles eligible for benefits using data from the National Highway Traffic Safety Administration and taking into account the decreasing number of class vehicles in service each year. (*Id.* at 4.) He then estimated the percentage chance that a given class vehicle would experience a water ingress incident by using warranty data the defendants provided. (*Id.* at 5–6.) Multiplying this percentage by the estimated number of vehicles, Dr. Eads calculated the total number of future repairs avoided. (*Id.* at 6.) Finally, he applied the labor, parts, towing, and loaner costs avoided, discounted this to present value using the interest rate of 2.7%, and calculated the

---

*v. Dallas Cowboys Football Club Ltd.*, 157 F.Supp.2d 561, 575 (E.D.Pa.2001); *see also Boone v. Philadelphia*, 668 F.Supp.2d 693, 702, 715 (E.D.Pa.2009) (deducting administrative expenses from the value of the settlement fund); *Tenuto v. Transworld Sys. Inc.*, Civ. No. 99–4428, 2002 WL 188569, at *4 (E.D.Pa. Jan. 31, 2002) (same); *but see In re Am. Investors Life Ins. Co. Annuity Marketing & Sales Practices Litig.*, 263 F.R.D. 226, 244 (E.D.Pa.2009) (including administrative costs in the value of the settlement); *Parker v. Time Warner Entm't Co., L.P.*, 631 F.Supp.2d 242, 269 (E.D.N.Y.2009) (including administrative costs in the value of the settlement); *Varacallo*, 226 F.R.D. at 233, 250 (including administrative costs as part of the value of the settlement); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 354 (N.D.Ga.1993) (rejecting objectors' argument that the settlement value should not include the payment of the expenses for claims administration).

**70.** The subclasses, and the number of vehicles in each are as follows: Subclass 1: MY 2001–2005 Passat—Service Actions P9 and P9/66C8 (353,610 vehicles); Subclass 2: MY 2002 Audi A4 and A6—Service Action JU/51/B7

(43,246 vehicles); Subclass 3: MY 2001–2007 New Beetle, MY 2001–2006 A4 Golf/GTIs, and MY 2001–2005 A4 Jettas—Proposed New Service Action (685,986 vehicles); Subclass 4: MY 1999–2001 Passat vehicles not included in service actions but eligible for reimbursement (182,608 vehicles); Subclass 5: MY 1997–2006 Audi A4 and MY 1998–2005 Audi A6 (including Cabrio, S, and RS versions) vehicles not included in service action but eligible for reimbursement (462,040 vehicles); Subclass 6: MY 2006–2007 Golf/GTI A5 and MY 2005–2007 Jetta A5 vehicles not included in new service action but eligible for reimbursement (194,917 vehicles); Subclass 7: All other class vehicles-only receive educational preventative information and are not eligible for reimbursement (1,084,838 vehicles).

**71.** Dr. Eads's report details the calculation of the future repair cost avoided for MY01–05 Passat vehicles as an example. Details of the calculations for other vehicles were not included in the report, but he represented that they were included in an excel workbook titled "MASTER_Settlement Class Categories V3.xls," (*Dewey*, Docket Entry No. 197 Attach. 10 at 6), that was not presented to the Court.

total present value of repair costs avoided for subclasses 4, 5, 6, and 7 to be $2,373,554, $1,782,920, $960,630, and $7,991,783, respectively, for a total of $13,108,887. (*Id.* at 8–9, 16.)

To calculate the future value diminution avoided, Dr. Eads relied on Richard Hixenbaugh's report on diminished value and data from the Kelley Blue Book concerning the effect that water damage has on a vehicle's value. (*Id.* at 13.) Dr. Eads employed a regression analysis to calculate future projected avoided diminished value for each vehicle and for each future year the car is expected to be in service. (*Id.* at 14.) He then calculated the present value of the benefit for each subclass of vehicles. (*Id.* at 15.) As a result, he opined that the diminished value avoided for subclasses 4, 5, 6, and 7 is $3,362,710, $2,489,858, $1,151,134, and $8,620,855, respectively, for a total of $15,624,557. (*Id.* at 16.)

Adding the future repair cost avoided of $13,108,887 and future diminution value avoided of $15,624,557 together, Dr. Eads arrived at a total value of $28,733,445 for the educational preventative maintenance information. (*Id.*)

The Court rejects these valuations for several reasons. First, Dr. Eads conceded at the Fairness Hearing that towing and loaner car costs would likely be paid by the dealer and not borne by the vehicle owner or lessee. (Fairness Hearing.) Because this is not a cost the class member would ever bear, this is not a value that the settlement provides. Thus, the future repairs cost avoided is inflated. Second, the direct value of the preventative maintenance portion of the settlement is the costs that the class members will not have to pay for repairs because they now have a means to prevent the damage for which repair would be needed. While this will have collateral benefits such as avoiding aggravation and inconvenience that interior water damage may cause and ensuring

that the car's value is not diminished by water damage, these benefits are already covered by preventing them altogether and the value of the prevention is best estimated by the costs avoided by engaging in the repair and maintenance. Third, and relatedly, counting both the value of avoiding future repairs and the diminution of the value of the car if it suffered from water damage is akin to double counting. While the two components address different consequences of the avoided water damage, one of the two will never come about because the maintenance avoids it. If preventative maintenance information avoids the water damage the design problem allegedly causes, then no water damage will occur and the car's value will not diminish. If the Court were to also award the value of future diminution avoided, the Court would be assigning value for something that would not happen at all, and thereby provide a windfall. Finally, proving claims of diminished value is difficult because such claims have been viewed as "speculative" and not as readily ascertainable as out-of-pocket losses. *Vaughn v. Am. Honda Motor Co.*, 627 F.Supp.2d 738, 749 (E.D.Tex.2007).

For these reasons, the Court assigns as the value for preventative maintenance the costs of repairs avoided. Because this is a non-cash component of the settlement and courts consider noncash components to be less valuable than cash and the defendants have not challenged the figure, the Court assigns a value of $13,108,887, or the value of future repairs avoided, to this portion of the settlement. *See McCoy*, 569 F.Supp.2d at 478 (applying the parties' lowest estimated value of the injunctive relief); see *also Frankenstein*, 425 F.Supp. at 764–65 (assigning the lowest estimated value to a settlement where the opinion of the plaintiff's expert was not challenged).

## B. Value of the Reimbursement Funds

To calculate the value of the reimbursement funds for vehicle subclasses 4, 5, and 6, Dr. Eads assumed 100% participation in the claims process to calculate the expected total number of incidents eligible for reimbursement, multiplied this figure by the average total claim cost for each relevant vehicle, and subtracted the value of claims that had already been paid to arrive at the settlement value of these reimbursement funds.[72] (*Id.* at 10–11.) Dr. Eads calculated the value of the reimbursement funds for subclasses 4, 5, and 6 to be $5,676,336, $1,340,632, and $922,633, respectively. (*Id.* at 17–18.) He also calculated the value of the reimbursements for the New Proposed Service Action for subclass 3 to be $6,641,434. (*Id.* at 11, 17.) He opined that the total value of the reimbursement funds for subclasses 3–6 is $14,581,035. Subclass 7 is not eligible for reimbursement. (*Id.* at 11.)

Because Dr. Eads calculated a total of $14,581,035 in actual and potential reimbursements for subclasses 3–6, (*see id.* at 11), but the settlement agreement only allows class members a benefit of $8 million in reimbursements for these vehicles, (*Dewey*, Docket Entry No. 174 Attach. 1 at 19), Dr. Eads reduced the value of this portion of the settlement to $8 million by subtracting $6,581,035 from his value of the reimbursements. (*Dewey*, Docket Entry No. 197 Attach. 10 at 8.)

Dr. Eads calculated the value of reimbursements associated with Service Actions P9, P9/66C8, and JU mindful that some reimbursements had already been made under the terms of these service actions separate and apart from reimbursements paid from the $8 million reimbursement fund. (*Dewey*, Docket Entry No. 197 Attach. 1 ¶¶ 11–12; *Dewey*, Docket Entry No. 213 Attach. 4 ¶ 6.) For these reimbursements, Dr. Eads looked at both potential reimbursements and actual reimbursements that had already been made. (*Dewey*, Docket Entry No. 197 Attach. 10 at 10.) The dollar value of actual reimbursements, as of May 2010, was $949,838 for Service Actions P9 and P9/66C8 and $128,786 for Service Action JU. (*Id.*) To determine the value of potential reimbursements, Dr. Eads assumed a 100% response rate for the remaining vehicles eligible for service under Service Actions P9, P9/66C8, and JU and applied the average cost per claim to each vehicle.[73] (*Id.*) Adding the actual and potential reimbursement values together, Dr. Eads calculated a total value of $1,326,441 for Service Actions P9 and P9/66C8 and $169,906 for Service Action JU. (*Id.*)[74] According to the updated information set forth in Mr. Slater's second supplemental certification, however, the dollar value of actual reim-

---

72. Dr. Eads's report did not provide the details regarding reimbursement calculations for each of the vehicles in subclasses 4, 5, and 6. He represents that these details were contained in an excel workbook titled "Estimates of Reimbursements.xls," (*Dewey*, Docket Entry No. 197 Attach. 10 at 9), but they were not presented to the Court.

73. Dr. Eads did not include the number of eligible vehicles or average cost per claim in his report. He represents that the details of his valuation of the reimbursements are included in an excel workbook titled "Estimates of Reimbursements.xls," (*Dewey*, Docket En-

try No. 197 Attach. 10 at 9), which was not provided to the Court.

74. Although class counsel submitted a chart setting forth the components of their $90 million valuation and valued the reimbursements for subclasses 1 and 2 at $1,492,347 (the sum of the $1,326,441 for Service Actions P9 and P9/66C8 and the $210,418 for Service Action JU), (*See* Fairness Hearing Ex. P–1.), this value failed to account for the reimbursements already made as set forth in Mr. Slater's second supplemental certification dated July 23, 2010. (*Dewey*, Docket Entry No. 240 at 5.)

bursements, as of July 23, 2010, was $1,218,872.51 for Service Actions P9 and P9/66C8 and $166,230.53 for Service Action JU. (*Dewey*, Docket Entry No. 240 at 5.)

The Court rejects some of the values assigned. The assumption of 100% participation that Dr. Eads employed is inappropriate. Because the actual reimbursements made represent 78% of the eligible vehicles for Service Actions P9 and P9/66C8 and 79% of the eligible vehicles for Service Action JU, (*Dewey*, Docket Entry No. 240 at 5), there is uncertainty as to whether every class member within the remaining 22% and 21%, respectively, will participate.[75] Moreover, an assumed 100% participation rate has been rejected by the case law. Courts have noted that, even in the simplest cases, a participation rate of no more than 10–15% is reasonably expected. *See Sylvester*, 369 F.Supp.2d at 44 (recognizing that 10% participation is what should be expected); *see also In re Mexico Money Transfer Litig.*, 267 F.3d at 748 (approving a settlement with an estimated 10–15% participation rate). Consequently, the Court will assign as value to this component of the settlement only the value of reimbursements already made plus 15% of the value of the remaining projected reimbursements. Therefore, the Court will assign the reimbursements for Service Actions P9 and P9/66C8 a value of $1,270,440 (calculated using $1,218,872.51 of reimbursements already made plus 15% of the difference between this value and $1,562,657, which would be the value with 100% participation) and Service Action JU

a value of $172,859 (calculated using $166,230.53 of reimbursements already made plus 15% of the difference between this value and $210,418, which would be the value with 100% participation).

As to the portion attributed to vehicles not eligible for Service Actions P9, P9/66C8, and JU, the parties agreed to a reimbursement fund not exceeding $8 million. While Dr. Eads's valuation of this portion of the settlement is approximately $14.5 million and this arguably shows that the $8 million reimbursement fund is underfunded and more cash should be placed in the fund to ensure that all members of the class eligible for cash reimbursement receive it, these calculations cannot and do not increase the value of the cash portion of the settlement. The value of this part of the settlement is limited to $8 million because that is the total amount of cash available to eligible class members. No more and no less. Therefore, the Court will assign the reimbursements component of the settlement a value of $9,443,299, which is the sum of the $8,000,000 value for subclasses 3–6, $1,270,440 for Service Actions P9 and P9/66C8, and $172,859 for Service Action JU.

## C. Value of the Proposed Service Action, Service Action P9, Service Action P9/66C8, & Service Action JU

To calculate the value of a particular service action, Dr. Eads considered: (1) the value of the service work performed and to be performed; (2) the future repair cost avoided; and (3) the future value diminution avoided. (*Dewey*, Docket Entry No. 197 Attach. 10 at 17–19.)[76]

---

[75] Although the actual value depends on the number of class members who submit claims, such uncertainty does not preclude defining a fund as a common fund. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 477, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) (allowing attorneys' fees under the common fund doctrine even when a portion of the fund is unclaimed since each class member had present interest and absentee class members had received a bene-

fit within the meaning of the common-fund doctrine).

[76] Dr. Eads also included the value of reimbursements when calculating the value of each service action, but for purposes of this summary, these reimbursements are discussed in the section of the Opinion titled "Value of the Reimbursement Funds."

The value of the service work for a particular service action includes: (1) the cost of work already performed and (2) future costs for repairs not yet performed. (*Id.* at 12.) The dollar value of work already performed, as of May 2010, was $23,427,919 for Service Actions P9 and P9/66C8 and $1,822,550 for Service Action JU. (*Id.*) The dollar value of service work performed, as of July 23, 2010, was $23,808,278.58 for Service Actions P9 and P9/66C8 and $1,844,739.67 for Service Actions JU. (*Dewey,* Docket Entry No. 240 at 5.) These figures represent participation of 78% of the vehicles eligible for Service Actions P9 and P9/66C8 and 79% of the vehicles eligible for Service Action JU. (Id.)

Using the May, rather than July, information to determine the value of future repair costs,[77] Dr. Eads assumed a 100% response rate for eligible vehicles under Service Actions P9, P9/66C8, and JU when calculating the number of vehicles that would be brought in for service. (*Id.*) He then multiplied the average cost per vehicle, which he claims to be $92.73 for Service Actions P9 and P9/66C8 and $54.29 for Service Action JU, by the number of eligible vehicles to arrive at the value of future repair costs for Service Actions P9, P9/66C8, and JU. (*Id.*) Adding the value of future repair costs to the dollar value of work already performed, Dr. Eads calculated the total value of service work for Service Actions P9 and P9/66C8 to be $32,791,501 and for Service Action JU to be $2,347,870. (*Id.*) Using the July information and applying Dr. Eads's assumption of 100% participation, Dr. Eads would have assigned a total value of $30,523,434 for Service Actions P9 and P9/66C8 and $2,335,114 for Service Action JU.

To value the proposed new Service Action, Dr. Eads estimated the total number of applicable vehicles in service at the end of 2009 to be 624,429. (*Id.*) Using a predetermined time per service of 0.3 hours for Golf/GTI/Jetta vehicles and 0.5 hours for New Beetle vehicles and an average hourly labor rate of $91.52 per hour, he arrived at a cost per repair for each vehicle and calculated the total value of future repair costs for the new Service Action to be $20,155,221. (*Id.*)

More concrete information, however, became available after Dr. Eads issued his report. As of July 23, 2010, costs of $3,916,826.71 were incurred for services provided to 97,711 vehicles as part of the new proposed Service Action, representing a completion rate of 14.3%. (*Dewey,* Docket Entry No. 240 at 5.) This yields a cost per vehicle of $40.09. Applying this cost per vehicle to the 624,429 applicable vehicles Dr. Eads estimated to be in service at the end of 2009 and assuming a 100% participation rate, the total estimated value of future repair costs of $25,033,358.

The future repair cost avoided and the future value diminution avoided as a result of the service actions were calculated in the same manner as they were for the value of the educational preventative maintenance program. Because each of the service actions applied to specific subclasses of vehicles, Dr. Eads only considered subclass 1 for the value of Service Actions P9 and P9/66C8, subclass 2 for the value of Service Action JU, and subclass 3 for the value of the new Service Action. (*Id.* at 9–10.) Dr. Eads calculated the future repair cost avoided to be $13,405,253 for Service Actions P9 and P9/66C8, $110,880 for Service Action JU, and $10,936,681 for the new Service Action. (*Id.* at 17–19.) The

---

**77.** Dr. Eads represents that details regarding the calculation of the value of service actions are contained in an excel workbook not made available to the Court titled "Work performed in service actions.xls." (*Dewey,* Docket Entry No. 197 Attach. 10 at 11.)

parties explained that only one percent of all vehicles would experience water damage and Dr. Eads opined that if such damage occurred, it would cost $24,452,814 to repair. Despite these calculations, at the Fairness Hearing the parties announced their agreement to limit the value of this portion of the settlement to $12,104,174. (Fairness Hearing at Ex. P–1.) The parties stated that they decided to seek a value of no greater than $12,104,174 based only on their private negotiations and not because the plaintiffs believed that the full amount was inappropriately included as part of Dr. Eads's overall evaluation. Regardless of the parties' agreement, and for the reasons set forth herein, this figure will not be included in the Court's valuation of the settlement.

Dr. Eads also calculated the future value diminution avoided to be $10,734,618 for Service Actions P9 and P9/66C8, $194,801 for Service Action JU, and $13,217,591 for the new Service Action. (Id.) In total, not including monetary reimbursements already discussed, Dr. Eads calculated the value of the new Service Action, Service Actions P9 and P9/66C8, and Service Action JU to be $44,309,493, $56,931,372, and $2,649,551 respectively, for a total of $103,890,416. (Id. at 17–19.)

The Court finds that including the value of repair costs avoided, the value of diminution avoided, and the value of the repair being provided is akin to a triple count in this case. If a repair in connection with a service action is made, then there will be no future repairs needed and no loss of value to the car due to water damage since no damage will occur because the repair work was performed. Once service work

has been performed on a given vehicle, the value of future repair costs [78] and avoided diminution are captured by the very real and concrete number reflecting the actual cost of the service work, so including avoided future repair costs and diminution and speculative and would be windfalls in the calculation. When a court has concrete numbers, it need not assign a value based on estimates or extrapolations. Accordingly, the Court will assign value only to the repair work performed for each service action.

The Court, however, finds Dr. Eads's proposed value for the repair work to be inflated. Dr. Eads inappropriately assumes 100% participation by class members in the service actions. The present record of responses to the service actions indicates a response rate of 78% for Service Actions P9 and P9/66C8 and a response rate of 79% for Service Action JU. (Dewey, Docket Entry No. 240 at 5.) There is uncertainty as to whether the remaining 22% and 21%, respectively, will participate in Service Actions P9 and P9/66C8 and JU, and given that Courts do not assume a 100% participation rate, the Court will assign only the value to this portion of the settlement based upon the value of the service work already performed plus the value of the repair to be provided to 15% of the remaining class members who have not yet had service work performed. See Sylvester, 369 F.Supp.2d at 44; See also In re Mexico Money Transfer Litig., 267 F.3d at 748. Accordingly, Service Actions P9 and P9/66C8 will be assigned a value of $25,155,762 (calculated using $23,808,278.58 of service work already performed plus 15% of the difference between

---

**78.** The Court also rejects this component of the settlement valuation because it is unclear that a jury could ever be asked to award a plaintiff money that reflects the repair costs avoided as it would be speculative and potentially constitute a windfall. Using an analogy, a jury would not award a party both the cost of repair and the cost of repairs they would never bear because the problem was fixed. The jury could only award the cost to be borne to fix the problem. A plaintiff would not be compensated for something never lost.

this value and $30,523,434) and Service Action JU will be assigned a value of $1,918,296 (calculated using $1,844,739.67 of service work already performed plus 15% of the difference between this value and $2,335,114). To value the new proposed Service Action, the Court will apply an estimated response rate percentage of 78.5%, which is the average between the two response rates for P9 and P9/66C8 and JU Service Actions. Accordingly, the new proposed Service Action will be assigned a value of $19,651,186 (calculated by applying the 78.5% participation rate to a value of $25,033,358 obtained by assuming 100% participation).

Based upon the above, the Court values the settlement as totaling $69,277,430 comprised of the following values:

| | |
|---|---|
| Educational preventative maintenance information: | $13,108,887 |
| Value of reimbursements: | $ 9,443,299 |
| Value of service work for Service Actions P9 and P9/66C8: | $25,155,762 |
| Value of service work for Service Action JU: | $ 1,918,296 |
| Value of service work for the new proposed Service Action: | $19,651,186 |
| Total: | $69,277,430 |

Although the Court has discounted both valuation figures that the plaintiffs advanced, there is no doubt that class counsel's efforts secured valuable benefits for a large number of vehicle owners and lessees.

**b. The Presence or Absence of Substantial Objections By Members of the Class to the Settlement Terms and/or Fees Requested by Counsel**

■ The second factor the Court must consider is the presence or absence of substantial objection by class members to the settlement terms and/or counsel's fee request. *In re Rite Aid,* 396 F.3d at 305. The "absence of large numbers of objections mitigates against reducing fee awards." *Yong Soon Oh,* 225 F.R.D. at 152 (determining this factor weighed in

favor of approving fees where three of the thousands of potential plaintiffs objected to fees); *In re Cendant Derivative,* 232 F.Supp.2d at 337 (determining this factor weighed in favor of approving fees where six of the 200,000 shareholders noticed objected to fees); *see also In re Rite Aid,* 396 F.3d at 305 (describing two objections after notice to 300,000 class members as a low level). Indeed, the Court of Appeals has stated that "silence constitutes tacit consent to the agreement" to the proposed fees. *In re Gen. Motors,* 55 F.3d at 812 toting *Bell Atl. Corp. v. Bolger,* 2 F.3d 1304, 1314 n. 15 (3d Cir.1993).

As of July 26, 2010, 203 class members objected to the settlement or fees, (*Dewey,* Docket Entry No. 216 ¶ 11; Fairness Hearing), and 1,119 sought exclusion from the class. (*Dewey,* Docket Entry No. 241 ¶ 8.) Given the large number of class members, this reflects an objection or request for exclusion from less than 1% of the class. While a majority of the objections concerned counsel's fee request, this extraordinarily low percentage of class members voicing dissatisfaction about the settlement terms shows that the supermajority of the class consents to the settlement and/or does not oppose a fee award, and thus, this factor accordingly supports awarding class counsel fees.

**c. Counsel's Skill and Efficiency**

■ Third, the Court considers the skill and efficiency of the attorneys involved in this case. *In re Rite Aid,* 396 F.3d at 301. Courts consider the result and an attorney's reputation, experience, and resume in assessing his skill and efficiency. *See In re Cendant Derivative,* 232 F.Supp.2d at 338.

In this case, class counsel secured a settlement that provides direct benefits to class members. While the Court has rejected the large figure Dr. Eads assigned to the value of the settlement and the

valuation plaintiffs later endorsed, there is no doubt that the class has received and will receive concrete benefits. Many, if not all, class members will receive information about preventative maintenance, others will receive notice to bring their cars in for service to repair the problem that allegedly leads to the water damage, and others will receive reimbursement for costs they incurred to fix the problem and the collateral consequences of the water damage, such as carpet cleaning and replacement. Counsel's hard work to secure relevant information, their knowledge about the alleged injuries to the class, and the techniques they proposed to remedy the damages enabled counsel to obtain creative solutions tailored to the issues unique to the various makes and models of vehicles the class members owned and leased. Because the "single clearest factor reflecting the quality of counsel's services is the result obtained," *In re Cendant Derivative*, 232 F.Supp.2d at 338; *see also In re Rite Aid*, 396 F.3d at 304 (determining that counsel was "extraordinarily deft and efficient in handling this most complex matter" because, among other things, he negotiated a particularly favorable noncash settlement); *In re Linerboard Antitrust Litig.*, MDL No. 1261, 2004 WL 1221350, at *5 (E.D.Pa. June 2, 2004) (stating "the result achieved is the clearest reflection of petitioners' skill and expertise"), and as there is no doubt a good result was achieved, the Court has a sufficient basis to conclude that counsel possessed the skill to handle this case and secure an appropriate result even though, as explained herein, the Court rejects the value the parties assigned to the settlement.

#### d. Complexity and Duration of Litigation

▉ The fourth factor the Court must consider is the complexity and duration of this litigation. *In re Rite Aid*, 396 F.3d at 301. In evaluating this factor, courts consider numerous aspects of the case, including the complexity of both the factual and legal issues, the amount of discovery and depositions conducted, the length of the litigation, the amount and quality of work produced, and attempts to negotiate and settle. *See id.* at 305 (taking into consideration the legal and factual complexities, time incurred reviewing and analyzing hundreds of thousands of documents, the fact that settlement occurred after several years of litigation and with the assistance of mediation, and the numerous revised pleadings); *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 735–36 (3d Cir.2001) (hereinafter "*In re Cendant PRIDES*") (criticizing the district court for failing to consider that the case was "relatively simple," defendant had conceded liability, settlement occurred at a very early stage of litigation, and there was minimal motion practice and little discovery); *In re Cendant Derivative*, 232 F.Supp.2d at 338–39 (noting that the case had been pending for four years and required a great deal of discovery, motion practice, and the development of new law); *accord Yong Soon Oh*, 225 F.R.D. at 152.

Some of these considerations support this fee application. Class counsel expended 12,195.5 hours on this case. (*Dewey*, Docket Entry No. 194 Attach. 1 at 28; *Dewey*, Docket Entry No. 195 Attach. 1 ¶ 12; *Dewey*, Docket Entry No. 196 Attach. 2 at 12.) A significant portion of these hours was spent obtaining and reviewing thousands of warranty claims and other documents, some of which were in foreign languages, conferring with experts, and conducting depositions. In addition, time was spent learning about the nature of the plenum and sunroof drain systems and the alleged defects. This involved reviewing design drawings, technical specifications, and even a chemical analysis of certain components so as to understand why certain components clogged. (*Dewey*,

Docket Entry No. 196 Attach. 1 ¶ 7; *Dewey*, Docket Entry No. 197 Attach. 1 ¶¶ 5–7.) The sheer volume of information about numerous models, model years, and manufacturers required thousands of hours to digest, evaluate, and use thoughtfully to advance the claims in the case.

Other considerations, however, do not support the amount of the fee requested. The award sought is largely based upon securing a fee based upon a settlement that the plaintiffs assert has a value exceeding $90 million.[79] For the reasons already discussed, this valuation is inflated and therefore cannot serve as the basis on which the fee award is calculated. This factor weighs against awarding the full amount of class counsel's fee application.

### e. The Risk of Nonpayment

■ Fifth, the Court must consider the risk that counsel would not receive payment for the services provided in this case. *In re Rite Aid*, 396 F.3d at 301. Courts generally do not consider counsel's risk of not being paid or receiving its contingency fee. *See In re Cendant Derivative*, 232 F.Supp.2d at 339 (recognizing that the risk of being unsuccessful and thus not getting paid is a risk confronted by all attorneys in every case taken on a contingency-fee basis and determining that the risk of nonpayment factor was "neutral" in the evaluation of approving fees); *but see In re Pet Food Prods. Liab. Litig.*, Civ. No. 07–2867, 2008 WL 4937632, at *22 (D.N.J. Nov. 18, 2008) (noting that "[a]t the time that plaintiff's counsel undertook representation, they faced significant hurdles and the possibility of non-recovery. Courts have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees."). Rather, courts evaluating the factor focus on a defendant's financial health

and the likelihood that it would be unable to satisfy a successful judgment against it. *In re Cendant Derivative*, 232 F.Supp.2d at 339 (determining this factor weighed in favor of approving fees where there was a chance that the defendant might go out of business and the plaintiffs confronted risks in establishing the defendant's liability); *Gunter*, 223 F.3d at 199 (indicating that this factor militated in favor of granting fees where "the defendants were close to insolvency, and ... [other] plaintiffs in similar cases ... had lost on similar legal theories"). Thus, the fact that class counsel took the case on a contingent fee basis with the chance that they might not be compensated for their efforts in the case if they lose is not relevant. (*Dewey*, Docket Entry No. 194 Attach. 1 at 30.)

In this case, while the foreign defendants initially challenged service in an effort to avoid litigation, there is nothing before the Court that indicates that the defendants would be unable to satisfy a judgment against them or that their financial health is in jeopardy. Thus, this factor is neutral.

### f. The Amount of Time Devoted to the Case by the Plaintiffs' Counsel

The sixth factor that the Court considers is the amount of time that the plaintiffs' counsel devoted to the case. *In re Rite Aid*, 396 F.3d at 301. While courts may look to counsel's time sheets and affidavits, *see Yong Soon Oh*, 225 F.R.D. at 152, the district court "may rely on summaries submitted by the attorneys and need not review actual billing records." *In re Rite Aid*, 396 F.3d at 307; *see also In re AT & T Corp.*, 455 F.3d at 169 n. 6 (courts have discretionary authority to request time sheets or may rely on declarations). The appellate court has also held

79. Notably, the $22.5 million fee award requested has not changed even though the plaintiffs reduced the value that they sought to have assigned to the settlement by over 36%, namely from $142 million to $90 million.

that this factor overlaps with the third factor, which deals with the skills and efficiency of the attorneys' prosecution of the case. *Id.* at 171.

 Here, class counsel expended over 12,000 hours on this case. (*Dewey*, Docket Entry No. 196 Attach. 2 at 12; Docket Entry No. 195 ¶ 18; *Dewey*, Docket Entry No. 240 ¶¶ 4–5; *Dewey*, Docket Entry No. 242 ¶ 3.) The defendants broadly assert that "a number of challenges could be made to individual items reflecting over-billing or overstaffing," (*Dewey*, Docket Entry No. 219 at 14), and appropriately challenge the high hourly rates requested, but they have not identified specific tasks that were unreasonably undertaken or on which too much time was spent. Considering the amount of time spent by the attorneys on this matter and the number of vehicles and designs; as well as the absence of specific objections by the defendants or the class to the hours expended on specific tasks, this factor weighs in favor of a finding only that the number of hours that class counsel spent is reasonable. *See In re Cendant PRIDES*, 243 F.3d at 734 (5,600 hours); *In re AT & T Corp.*, 455 F.3d at 172 (48,000 hours); *In re Rite Aid*, 396 F.3d at 306 (12,906 hours). Moreover, the Court cannot ignore class counsel's ongoing obligation to the millions of class members for which additional time will be spent without further compensation.

### g. The Awards in Similar Cases

 Lastly, the Court compares the award requested in this action with the awards in similar actions. *In re Rite Aid*, 396 F.3d at 301. In doing so, the Court (1) compares the actual award requested to other awards in comparable settlements; and (2) ensures that the award is consistent with what an attorney would have likely received if the fee was negotiated on the open market. *See In re Datatec Sys.*,

*Inc. Sec. Litig.*, Civ. No. 04–525, 2007 WL 4225828, at *8 (D.N.J. Nov. 28, 2007); *In re Ins. Brokerage Antitrust Litig.*, Civ. No. 04–5184, 2007 WL 2916472, at *7 (D.N.J. Oct. 5, 2007).

The Court of Appeals for the Third Circuit has held that since percentages of attorneys fees awarded have varied considerably, the Court "may not rely on a formulaic application of the appropriate range in awarding fees but must consider the relevant circumstances of the particular case." *In re Cendant PRIDES*, 243 F.3d at 736. Accordingly, in most cases, the courts have held that the percentages will decrease as the size of the fund increases because "[i]n many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." *In re Prudential*, 148 F.3d at 339 (quoting *In re First Fidelity Bancorporation Sec. Litig.*, 750 F.Supp. 160, 164 n. 1 (D.N.J.1990)); *see also In re Rite Aid Corp. Sec. Litig.*, 146 F.Supp.2d 706, 735 (E.D.Pa.2001) ("*In re Rite Aid*") (a review of 289 settlements demonstrating "average attorney's fees percentage [of] 31.71%" with a median value that "turns out to be one-third"); *In re Cendant PRIDES*, 243 F.3d at 736 (noting that most fee awards in common fund cases range "from nineteen percent to forty-five percent of the settlement fund").

The percentage of the plaintiffs' requested amount of $22,500,000 is 15.83% of the $142 million value that the plaintiffs originally assigned to the settlement. During the Fairness Hearing, the plaintiffs asked for the same award but said that it represented 25% of the $90 million value they now ask the Court to accept. The plaintiffs, however, provided no reason why the percentage should increase. The only change was the parties' private agreement reached just one business day before the Fairness Hearing to advocate for a settle-

ment valued at $90 million. For the reasons already recited, the Court has rejected the valuation and must consider what percentage-of-recovery from a settlement value of $69,277,430 is reasonable.

Awards in similar cases are as follows: [80]

| Case | Value of Settlement | Attorneys' Fees Requested | Attorneys' Fees Granted | % of Fund | Lodestar | Lodestar Multiplier |
|---|---|---|---|---|---|---|
| O'Keefe | $32,645,220 | $7,000,000 | $4,896,783 | 15.00% | $1,650,360 | 2.97 |
| In re Chrysler | $17,769,224 | Requested multiplier | $3,109,614 | 17.50% | $1,647,155 | 1.89 |
| Trew | $24,000,000 | $1,385,000 | $1,385,000 | 5.77% | $1,573,095 | .88 |
| In re Gen. Motors | $1.98 to 21.8 billion | $9,500,000 | $9,500,000 | .44% to .48% | $3,158,182 | 3.01 |
| Castillo | $61,652,250 | $4,425,000 | $4,425,000 | 7.18% | $907,147 | 4.88 |
| McGee | $7,257,000 to $10,257,000 | $2,250,000 | $2,250,000 | 22% to 31% | $860,138 | 2.62 |
| Vaughn | $244,000,000 | $9,500,000 | $9,500,000 | 3.89% | $4,206,545 | 2.26 |

Comparing this case to similar cases, the plaintiffs original request of 15.83% (assuming a maximum settlement value of $69,277,430) is within the range of even the highest awards in this type of litigation. In the absence of any explanation by class counsel why the percentage should be raised to 25%, and the given percentages found in other cases, no greater percentage than the 15.83% originally requested is warranted.[81]

**80.** *O'Keefe*, 214 F.R.D. at 304, 310; *In re Chrysler Motors Corp. Overnight Evaluation Program Litig.*, MDL No. 740, 1990 WL 170601, at *1 (E.D.Mo. Sept. 25, 1990); *Trew v. Volvo Cars of N. Am.*, Civ. No. 05–1379, 2007 WL 2239210, at *5 (E.D.Cal. July 31, 2007); *In re Gen. Motors*, 55 F.3d at 782, 822; *Castillo v. Gen. Motors Corp.*, Civ. No. 07–2142, 2008 U.S. Dist. LEXIS 82337, at *32 (E.D.Cal. Sept. 5, 2008); *Castillo v. Gen. Motors Corp.*, Civ. No. 07–2142 (E.D. Feb. 27, 2009), ECF 68; *McGee*, 2009 WL 539893, at *16–17; *Vaughn*, 627 F.Supp.2d at 746, 750–51.

**81.** The fees that may be commanded on the open market must also be considered, *In re Remeron Direct Purchaser Antitrust Litig.*, Civ. No. 03–85, 2005 WL 3008808, at *16 (D.N.J. Nov. 9, 2005), and here, it supports the requested percentage. For example, "plaintiffs' counsel in private contingency fee cases regularly negotiate agreements providing for thirty to forty percent of any recovery." *Fanning v. Acromed Corp.*, Civ. No. 97–381, 2000 WL 1622741, at *7 (E.D.Pa. Oct. 23, 2000); *see also In re Merck & Co., Inc. Vytorin Erisa Litig.*, Civ. No. 08–285, 2010 WL 547613, at *12 (D.N.J. Feb. 9, 2010); *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 194 (E.D.Pa.2000). New Jersey Court Rule 1:21–7 also provides insight into what the New Jersey state courts view as reasonable percentages of recovery in contingency fee cases, even though it "does not apply to 'business torts' such as fraud or conspiracy to interfere with contractual relationships." R. 1:21–7 cmt. 1: *see Incollingo v. Canuso*, 297 N.J.Super. 57, 65, 687 A.2d 778 (App.Div. 1997); *see also In re Safety Components, Inc. Sec. Litig.*, 166 F.Supp.2d 72, 106 (D.N.J. 2001) (stating that "Rule 1:21–7 'does not apply to "business torts" such as fraud or conspiracy to interfere with contractual relationships'"). If the rule applied, counsel would receive no more than 33⅓% of the first $500,000 (which is $166,666.66), 30% on the next $500,000 ($150,000), 25% on the next $500,000 ($125,000), and 20% on the next $500,000 ($100,000). For cases involving recovery in excess of $2,000,000, Counsel may receive a reasonable fee upon application to the Court to be considered in light of all the circumstances. *See* R. 1:21–7(f). By these

#### iv. The Lodestar Cross–Check

 Application of the lodestar cross-check also shows why the full amount of the fees requested should not be awarded and why the percentage-of-recovery based on the Court's valuation of the settlement should be granted. The courts in this Circuit are directed to use the "lodestar method" to cross-check the reasonableness of a percentage-of-recovery fee award. *In re AT & T Corp.*, 455 F.3d at 164. The lodestar is calculated by multiplying the hours expended by an appropriate hourly rate. *In re Gen. Motors*, 55 F.3d at 819 n. 37. Then, the requested fee award, determined using the percentage-of-fee recovery method, is divided by the lodestar. *In re AT & T Corp.*, 455 F.3d at 164. The resulting number is the lodestar multiplier. *Id.* Judicial approval of the multiplier is "discretionary and not susceptible to objective calculation." *In re Prudential*, 148 F.3d at 340. The Third Circuit has recognized that "[m]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *In re Cendant PRIDES*, 243 F.3d at 742 (citing *In re Prudential*, 148 F.3d at 341). However, "when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award." *In re Rite Aid*, 396 F.3d at 306.

The multiplier that a district court accepts in any particular case must rest on a reasoned basis. *In re Prudential*, 148 F.3d at 340. The Court must articulate the particular facts of the case that justify applying that multiplier. *Id.* at 340–41. For example, "[m]ultipliers may reflect the risks of nonrecovery facing counsel, may serve as an incentive for counsel to undertake socially beneficial litigation, or may

reward counsel for an extraordinary result." *Id.* at 340; *see also In re AT & T Corp.*, 455 F.3d at 164 n. 4 (observing that "[t]he multiplier is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work"). Moreover, although the cross-check calculation does not require "mathematical precision," *id.* at 169 n. 6, applying multipliers for the risk that attorneys bore or for their expertise "require[s] particular scrutiny and justification." *In re Prudential*, 148 F.3d at 341 n. 121.

In *In re Cendant PRIDES*, the Third Circuit vacated an attorney fee award where the lodestar multiplier was seven and the lower court failed to calculate, explain, or justify the result. 243 F.3d at 742. The fund had a value ranging from $263.5 to $341.5 million and attorneys' fees constituted 5.7% to 7.3% of the total fund. *Id.* at 741 n. 25. The appellate court was "seriously troubled" by this result because the case was not legally or factually complex and required no significant motion practice or discovery. *Id.* at 742. The court stated that "[i]n all the cases in which high percentages were applied to arrive at attorneys' fees, the courts explained the extensive amount of work that the attorneys had put into the case, and appropriately the lodestar multiplier in those cases never exceeded 2.99." *Id.* at 742.

In *In re AT & T Corp.*, the Third Circuit affirmed an award with a cross-check multiplier of 1.28 where there was "significant time and effort devoted to the case by class counsel." 455 F.3d at 173. Most importantly, "the District Court did not justify its approval of the fee by reference to high fees in the past. It justified its

---

measures, the requested 15.83% on a $69,277,430 settlement would be within the

realm of reason.

approval by demonstrating this case was not an average case." *Id.* The Third Circuit described it as a "lengthy, relatively complex case." *Id.* Indeed, the District Court Judge in granting the multiplier had noted the "massive time and effort expended by Lead Counsel in litigating this action" as well as the counsel's "high level of proficiency and professionalism" in securing a sizeable award of $100,000,000 for the plaintiffs. *In re AT & T Corp. Sec. Litig.*, Civ. No. 00–5364, 2005 U.S. Dist. LEXIS 46144 at *32 (D.N.J. Apr. 22, 2005).

In this case, class counsel state that their fees under the lodestar method are $6,535,696.16, (*Dewey*, Docket Entry No. 194 Attach. 1 at 38; *Dewey*, Docket Entry No. 240 at 2–3; *Dewey*, Docket Entry No. 242 at 2), for the 6,036.80 hours of work that the Dewey counsel performed, (*Dewey*, Docket Entry No. 196 Attach. 2 at Ex. B; *Dewey*, Docket Entry No. 240 at 2–3), and 6,158.7 hours of work that the Delguercio counsel performed, (*Dewey*, Docket No. 195 Attach, 1 at 12; *Dewey*, Docket Entry No. 242 at 2), multiplied by the hourly rates that the plaintiffs argue are appropriate.[82] This total assumes that all hours billed were reasonable and the hourly rates of those performing these services are reasonable in this market and properly account for the nature of the work and the experience of the lawyer.[83] *In re Rite Aid*, 396 F.3d at 306 n. 14; *see also Blum v. Stenson*, 465 U.S. 886, 895–96 n. 11, 104

S.Ct. 1541, 79 L.Ed.2d 891 (1984). Applying the 15.83% percentage of recovery originally proposed by class counsel to the settlement value that the Court found to be warranted of $69,277,430 yields a fee of $10,967,773. Dividing this percentage-of-recovery fee award by the plaintiffs' claimed lodestar amount of $6,535,696.16 results in a lodestar multiplier of 1.68.[84]

This 1.68 multiplier results from the plaintiffs' counsel's proposed lodestar figure. The proposed lodestar figure, of course, is based on the high hourly rates that the plaintiffs' counsel contend apply to their work. The proposed rates are based not on the rates that the plaintiffs' counsel actually charge. Rather, the proposed rates are based upon their survey of the rates other attorneys charged in other cases. (*Dewey*, Docket Entry No. 195 ¶ 14.) Other than to say that they "infrequently bill clients on an hourly basis," (*Id.*), and argue that any rates previously presented to the Court are out of date, the plaintiffs' counsel have failed to provide a good reason for the Court to completely ignore their own past rates. As a result, the Court will consider the rates that plaintiffs' counsel had represented to this Court that they charged as of April, 2009.

In April, 2009, the Mazie Slater firm submitted a fee petition to this Court. *Drazin v. Horizon Blue Cross Blue Shield of New Jersey*, Civ. No. 06–6219, Docket Entry No. 268 at 11, Attach. 2 ¶ 16; Ex. O

---

**82.** The Court notes that the plaintiffs' firms suggest hourly rates for partners as high as $795 and for associates as high as $460. (*Dewey*, Docket Entry No. 195 Attach. 1 ¶ 18.) As stated later in the Opinion, nothing in this Opinion constitutes approval of or a finding that these amounts are reasonable rates for these services in this market.

**83.** The plaintiffs' lodestar calculation ($6,535,696.16) divided by the number of hours worked (12,195.5) leads to a blended hourly rate of $535.91. This number is the

direct result of the very high hourly rate that the plaintiffs have applied based solely on rates they assert other firms charge. (*Dewey*, Docket Entry No. 195 ¶ 14.) Using the lodestar figure discussed in the text and detailed in Appendix A, the blended hourly rate is $377.68.

**84.** If the Court had accepted Dr. Eads's valuation of $142,120,207 and applied the 15.83% proposed by class counsel, and accepted the lodestar figure, the lodestar multiplier would have been 3.44.

(D.N.J. Apr. 7, 2009). In the *Drazin* submission, they asked the Court to calculate their lodestar figure using the rates that they charged to their clients and asked the Court to award hourly billing rates of up to $560.00 for partners and up to $268.00 for associates. *Id.* at Ex. O. To address the concern that the April 2009 rates are "dated," the Court will apply the Consumer Price Index ["CPI"] in effect in June 2010. *Dewalt v. Sullivan,* 963 F.2d 27, 29 (3d Cir.1992). This results in an increase in the plaintiffs' counsel's hourly rates to as much as $572.41 for partners and $273.94 for associates.[85] These figures are on the high side of what other courts have recently approved,[86] *see, e.g., Grant v. OMNI Health Care Sys. of NJ, Inc.,* Civ. No. 08–306, 2010 WL 1799081, at *1 (D.N.J. May 4, 2010) (approving a $225 per hour rate); *Ellis v. Ethicon, Inc.,* Civ. No. 05–726, 2010 WL 715403, at *3 (D.N.J. Mar. 1, 2010) (approving a $350 award, reduced from $400); *L.J. ex rel. V.J. v. Audubon Bd. of Educ.,* 373 Fed.Appx. 294, 297–98 (3d Cir.2010) (finding a $400 per hour rate unsupportable); *Weber,* 262 F.R.D. at 451 (approving an attorney's $500 hourly rate); *O'Keefe,* 214 F.R.D. at 310–11 (approving a rate of $425); *McGee,* 2009 WL 539893, at *18 (approving an hourly rate of approximately $430), but they are far more aligned with economic reality than the proposed rates. A simple comparison between the rates represented to be the amounts charged in April 2009 and the rates that the plaintiffs' counsel would like the Court to apply in July 2010 shows that the increased amounts cannot

be supported. As reflected in Appendix A, for example, the plaintiffs' counsel would like the Court to accept that their rates for hourly-rate clients would have increased in fourteen months by more than $235 per hour for the highest paid partners and by $210 per hour for the highest paid associate. This ignores the current economic climate and the reasonable rates in this market. The Drazin plus CPI rate provides a far more accurate barometer of the rates that the plaintiffs' counsel would charge their hourly-rate clients than the rates that other firms would charge. *Dewalt,* 963 F.2d at 29.

These rates would apply equally to the services of the Sporn firm. The work the Sporn firm performed was for a case filed in the District of New Jersey, not New York. Furthermore, this was not a situation where no competent New Jersey counsel was willing or able to take the case. *Interfaith Cmty. Org. v. Honeywell Int'l Inc.,* 426 F.3d 694, 717 (3d Cir.2005). In fact, competent New Jersey attorneys performed the same work as the Sporn firm in the same case.

The Drazin plus CPI rate yields a lodestar of $4,606,086.95. Dividing the percentage-of-recovery fee award of $10,967,773 by this lodestar figure results in a lodestar multiplier of 2.38. For the reasons set forth below, this multiplier is higher than what is warranted for this case. To begin with, the Court does not consider this case to have achieved such an extraordinary result that the plaintiffs' counsel should be paid more than twice the

---

**85.** Appendix A is a chart that sets forth the rates that the plaintiffs' counsel request in this case, the rates that the plaintiffs' counsel requested in *Drazin* in April 2009, and the value of those rates in June 2010 based upon the CPI, which will be referred to herein as the " *Drazin* plus CPI rate." To calculate the lodestar, the Court then multiplied the number of hours worked by the *Drazin* plus CPI

rate. For attorneys who did not work on the *Drazin* matter, the rates charged by attorneys of similar rank and experience were used.

**86.** These rates were used solely for performing a lodestar cross-check in this case and do not constitute a ruling that the rates would be approved.

lodestar figure. In this case, the plaintiffs' counsel has secured class members a settlement with a maximum value of more than $69 million, but as the plaintiffs' expert opines, the $8 million reimbursement fund is more than $6 million below that which he believed is needed for full value to each class member eligible for a reimbursement. (*Dewey*, Docket Entry No. 197, Attach. 10 at 20 n. 23.) While all settlements reflect compromise, the Court cannot ignore this deficiency.

Moreover, the Court must look at the multiplier based on the risk of recovery with "particular scrutiny and justification." *In re Prudential*, 148 F.3d at 341 n. 121. Here, there were risks. For instance, there were risks that the nationwide class covering multiple car models, model years, and manufacturers based on varying state laws may not have successfully been certified. That said, much of the risk and work needed in this case was the direct result of the plaintiffs' decision to pursue a nationwide state law-based class action based upon multiple vehicle models, model years, and manufacturers. Thus, the massive amount of work in this case was the direct result of the plaintiffs' decision to file their complaints as they did. They are the masters of their complaints and all of the attorneys and their clients became servants to them. Thus, the challenges that the plaintiffs faced were, in part, self-imposed. Moreover, this case was initiated more than three years ago, and more than ten months were spent on settlement. (*See Dewey*, Docket Entry Nos. 154, 176.) Thus, this settlement does not represent a particularly speedy resolution. *See, e.g., In re Cendant PRIDES*, 243 F.3d at 725 (six months between filing and fairness hearing); *In re Gen. Motors*, 55 F.3d at 779–82 (less than one year between filing and fairness hearing).

Finally, while there is no doubt that a great deal of labor was expended in this case, counsel did not file this action on a "blank slate," Several other similar cases were filed and the work done in those cases served as a template for this case. For instance, the *O'Keefe* settlement provided a good example for resolving this case. *See O'Keefe*, 214 F.R.D. at 303–04; *Weiss*, 899 F.Supp. 1297. These prior cases and the lessons learned from them likely advanced the work done here. Moreover, given the number of warranty claims made even before this suit really got started, the plaintiffs' counsel had a pre-existing pool of available plaintiffs who would have likely satisfied the numerosity and commonality requirements for at least one claim. (*Dewey*, Docket No. 197, Attach. 1 ¶¶ 11–13) (describing service actions issued in August 2007, then expanded in June 2008, which, while issued after the suit, shows that a large number of customer complaints were present).

Accordingly, the Court cannot reconcile the requested multiplier of 3.44 or the 2.38 multiplier based upon the *Drazin* plus CPI rate on this record, especially in light of the Third Circuit's finding of a multiplier of 1.28 to be reasonable where there was "significant time and effort devoted to the case by class counsel." *In re AT & T Corp.*, 455 F.3d at 173. As a result, the Court finds a percentage of recovery in the amount of 13.30% and the resulting lodestar multiplier of 2.0 are within the range the Circuit has approved and, as a result, fees in the amount of $9,207,248.19 will be awarded.

**v. Incentive Awards to Class Representative Plaintiffs**

According to Paragraph 4.5 of the Amended and Superseding Settlement Agreement, the defendants agreed to pay each class representative a $10,000 incentive award, together with any other benefits to which he or she is entitled under the

settlement, and the parties agreed that this amount would not reduce the benefits to the class. These payments, however, are subject to court approval. *Bernhard v. TD Bank. N.A.*, Civ. No. 08–4392, 2009 WL 3233541, at *2 (D.N.J. Oct. 5, 2009). As stated previously, incentive awards are "not uncommon in class action litigation and particularly where, as here, a common fund has been created for the benefit of the entire class." *Cullen*, 197 F.R.D. at 145 (internal quotation marks and citation omitted). This is because plaintiffs who serve as the representatives provide assistance and incur risks during the litigation not imposed upon any other putative class member. *Id.*

According to class counsel, each plaintiff actively participated in this litigation by attending meetings, participating in telephone conversations, collecting documents, answering interrogatories, preparing for and attending depositions, being willing to testify at trial, and, for those who still had possession of their vehicles, surrendering them on two separate occasions for inspections. (*See Dewey*, Docket Entry No. 197 ¶¶ 2–3.) As in *Cullen*, "the assistance of these plaintiffs provided the foundation upon which this case was built. They were not in any sense figurehead plaintiffs as is sometimes the case in class action suits. They were active clients. As a result of their having come forward, thousands of passive class members will receive significant benefit[s] from the settlement fund." 197 F.R.D. at 146. For

these reasons, and because the agreed upon amount is consistent with other cases, the Court will approve payment of $10,000 to each representative plaintiff: Kenneth Bayer, Jacqueline Delguercio, Patrick DeMartino, John M. Dewey, Lynda Gallo, Edward O. Griffin, Ronald Marans, Francis Nowicki, and Patricia Romeo. (*Dewey*, Docket Entry No. 173 ¶ 4.5); *see also In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 285 (finding district court did not err in approving a settlement that included a $10,000 incentive award for each representative plaintiff).

## F. *Expenses*

█ Under Rule 23(h), "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). Here, it is the parties' agreement and not Fed.R.Civ.P. 54(d) or any other statutory authority that gives rise to the plaintiffs' entitlement to reimbursement for costs. *See Merck Sharp & Dohme Pharm., SRL v. Teva Pharm. USA, Inc.*, Civ. No. 07–1596, 2010 WL 1381413, at *4–7 (D.N.J. Mar. 31, 2010); *Blake v. Nishimura*, Civ. No. 08–00281, 2010 WL 1372420, at *10 (D.Haw. Mar. 31, 2010) (holding local rules to be inapplicable). Therefore, state law cost rules do not apply, The plaintiffs bear the evidentiary burden of showing that a particular claimed cost is reasonable.[87] *See In re Safety Components Inc. Sec. Litig.*, 166 F.Supp.2d at 108 (requiring ex-

---

[87] If Fed.R.Civ.P. 54 governed, the prevailing party would have the benefit of a "strong presumption" that costs are to be awarded to it and the losing party would bear the "burden of making the showing that an award is inequitable under the circumstances." *In re Paoli R.R. Yard PCB Litig.*, 221 F.3d 449, 462–63 (3d Cir.2000). Under *Paoli*, a district court may "reduce a costs award, on equitable grounds, if the prevailing party, through bad faith or dilatory tactics has turned a rela-

tively simple case into a complex morass." *Id.* at 467. Because Rule 54(d), when applicable, provides a presumption that the losing party will pay the prevailing party's expenses, the district court may reduce or deny a requested costs award "[o]nly if the losing party can introduce evidence, and the district court can articulate reasons within the bounds of its equitable power" supporting the reduction or denial. *Id.*

penses to be adequately documented); *see also Garonzik v. Whitman Diner,* 910 F.Supp. 167, 172 (D.N.J.1995) (declining to award costs for particular reproduction because "plaintiffs have not shown how a copy was reasonably necessary to the trial"). In determining whether the expenses claimed by counsel in common fund cases are reasonable, the courts consider whether these expenses were adequately documented and appropriately incurred in the prosecution of the case. *McGee,* 2009 WL 539893, at *18; *In re Safety Components, Inc. Sec. Litig.,* 166 F.Supp.2d at 108; *Yong Soon Oh,* 225 F.R.D. at 154 (holding that the "submissions of counsel demonstrate that the requested expenses were adequately documented, reasonable and appropriately incurred"); *see also Steiner v. Hercules, Inc.,* 835 F.Supp. 771, 792 (D.Del.1993) (stating that courts look "to whether the expenses are reasonable, necessary to the prosecution of the litigation, and adequately documented"). A defendant is required to reimburse a plaintiff only for those costs reasonably incurred. *See Brusstar v. Se. Pa. Transp. Auth.,* Civ. No. 85–3773, 1988 WL 137319, at *4 (E.D.Pa. Dec. 21, 1988). Because not all expenses are recoverable costs, "those costs [awarded] often fall well short of the party's actual litigation expenses." *In re Paoli R.R. Yard PCB Litig.,* 221 F.3d at 464; *see also Baldi Bros. Constructors v. United States,* 52 Fed.Cl. 78, 86 (Fed.Cl. Ct.2002) (holding that a party is entitled to reimbursement only for expenses reasonably necessary to pursue the claim).

While not governing here, Fed.R.Civ.P. 54(d), L. Civ. R. 54.1, 28 U.S.C. § 1920, and the case law provide guidance for assessing the reasonableness and recoverability of the expenses. For example, L. Civ. R. 54.1(g) permits recovery of the costs incurred securing interpreters and witnesses who are not parties to the suit, taking depositions, preparing visual aids admitted into evidence, and obtaining copies of documents. Section 1920 of Title 28 of the United States Code defines the costs a clerk or judge may tax as follows:

(1) Fees of the clerk and marshal;

(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and cost of making copies of any materials where the copies are necessarily obtained for use in the case;

(5) Docket fees under § 1923 of this title;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920; *see also Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 441, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987) (holding that " § 1920 defines the term 'costs' as used in Rule 54(d)"). Although some federal courts limit recoverable costs to those authorized by § 1920 or other statutes, *Crawford Fitting,* 482 U.S. at 445, 107 S.Ct. 2494, others have been more expansive and held that a witness's travel and lodging for court or deposition appearances, reasonable photocopying expenses, telephone and facsimile charges, postal, messenger, express mail service charges, witness and expert fees, and computer-assisted research are often deemed incidental to and reasonably incurred in connection with a large litigation and thus recoverable. *Romero v. CSX Transp.,* Civ. No. 06–1783, 270 F.R.D. 199, 203-04, 2010 WL 2634312, at *4 (D.N.J. June 29, 2010) (explaining that 28 U.S.C. § 1821(c) contemplates reimbursement for witness travel at the most economical rate reasonably available or the mileage rate set for feder-

al employees if the witness drives a personal vehicle); *see also Interfaith Cmty. Org.*, 426 F.3d at 717 (holding that fees of non-testifying experts are recoverable); *Abrams*, 50 F.3d at 1225 (finding reproduction, telephone, and postage expenses as well as travel time to be recoverable); *Yong Soon Oh*, 225 F.R.D. at 154; *In re Safety Components, Inc. Sec. Litig.*, 166 F.Supp.2d at 108 (citing *Abrams*, 50 F.3d at 1225); *Defurio v. Elizabeth Forward Sch. Dist.*, Civ. No. 05–1227, 2008 WL 2518139, at *12 (W.D.Pa. June 19, 2008); *see also Daiichi Sankyo Co., Ltd., v. Apotex, Inc.*, Civ. No. 03–937, slip op. at 2–6 (D.N.J. Apr. 17, 2008) (allowing filing fees, trial transcripts, deposition transcripts); *Ricoh Corp. v. Pitney Bowes Inc.*, Civ. No. 02–5639, 2007 WL 1852553, at *4 (D.N.J. June 26, 2007) (allowing computer research expenses to be recovered); *In re Jacoby Airplane Crash Litig.*, Civ. No. 99–6073, slip op. at 2–17 (D.N.J. Oct. 7, 2008) (allowing expert fees, expert witness travel expenses, deposition transcripts but not photocopy, telephone or mailing costs to be recovered); *Crowley v. Chait*, Civ. No. 85–2441, slip op. at 2-14 (D.N.J. Aug. 29, 2007) (allowing costs for depositions and trial transcripts but not for photocopying); *Cullen*, 197 F.R.D. at 151; *In re Residential Doors Antitrust Litig.*, Civ. No. 96–2125, 1998 WL 151804, at *2 (E.D.Pa. Apr. 2, 1998); *see also In re Nassau Cnty. Strip Search Cases*, Civ. No. 99–3126, 2009 WL 706252, at *1 (E.D.N.Y. Mar. 16, 2009) (allowing reimbursement for expenses incurred in fulfilling obligations to members of the class); *but see Granger v. Infinity Title Agency, Inc.*, Civ. No. 07–6050, Order at 6–7 (D.N.J. July 2, 2009) (allowing filing fee but denying reimbursement for mailing).

 Here, the plaintiffs' counsel seek reimbursement totaling $1,003,652.15. The evidence concerning expenses is set forth in the Certification of Mr. Slater dated June 9, 2010, (*Dewey*, Docket Entry No. 195 Attach. 1 ¶ 20), the Supplemental Certification of Mr. Slater dated July 8, 2010, (*Dewey*, Docket Entry No. 224 ¶ 18), the Certification of Mr. Sporn, dated June 9, 2010 (*Dewey*, Docket Entry No. 196 Attach. 3 Ex. C), the Second Supplemental Certification of Mr. Slater, dated July 23, 2010, (*Dewey*, Docket Entry No. 240 at 2–3), and the Supplemental Certification of Mr. Sporn, dated July 23, 2010. (*Dewey*, Docket Entry No. 242 at 2.) In further support of their request, Dr. Eads testified about the hours he and his staff spent preparing his valuation report and the time associated with testifying at his deposition and the hearing. (Fairness Hearing Ex. P–4.)

Mr. Sporn's Certification includes a detailed breakdown taken from the books and records of his firm that are kept in the ordinary course of its business and lists the payees and expenses as follows:

| | |
|---|---:|
| **1. Investigation** | |
| American Trademark Investigations, Inc. | $ 804.17 |
| Carfax, Inc. | $ 95.09 |
| **2. Peter Van Suntum (Translator)** | $ 472.50 |
| **3. Research** | |
| LexisNexis—Research | $ 6,436.54 |
| Thomson Reuters—Research | $ 8,154.12 |
| Pacer | $ 394.24 |
| **4. Court Fees** | |
| Filing Fee—U.S.D.C., District of New Jersey | $ 150.00 |
| N.J. Lawyers Fund for Clients' Protection | $ 932.00 |
| Pro Hac Vice Admission Charges | $ 450.00 |
| **5. Service of Legal Papers and Witness Fees** | |
| Demovsky Lawyer Service | $ 6,885.10 |
| **6. Copying and Reproduction Costs** | |
| Aero Photo Print, Inc. | $ 45,976.59 |
| Ricoh Business Solutions | $ 24,810.48 |
| **7. Depositions Costs (Reporters, Videos, Transcripts)** | |
| Vertiex/New York Reporting Co. | $ 90,987.48 |
| Legal Link, a Merrill Corporation Co. | $ 145.00 |
| Steno–Kath Reporting Services Ltd. | $ 590.00 |
| Kelly McArdle & Assoc. | $ 936.25 |
| Mazie Slater Katz & Freeman, LLC (Payment toward Deposition, Video Costs) | $ 4,616.81 |
| Reporters Ink Corp. | $ 360.85 |
| **8. Expert and Consulting Fees** | |
| David McLennan | $ 15,722.56 |
| The TASA Group, Inc. (Technical Advisory Service for Attorneys) | $ 18,425.00 |
| Collision Claims Associates, Inc. | $ 3,506.25 |

| | |
|---|---|
| Rimkus Consulting Group | $ 2,400.00 |
| Charles River Associates | $ 23,700.35 |
| Dr. Vinnies Auto Repair (Vincent M. Competello) | $ 43,100.00 |
| Edward Labaton | $ 41,079.80 |
| 9. Travel, Lodging, Food | $ 20,597.16 |
| 10. Telephone, Fax, Postage | $ 5,575.00 |
| 11. Miscellaneous | |
| Federal Express | $ 5,143.59 |
| Delaware Division of Corporations | $ 10.00 |
| Edward Griffin (reimbursement for Travel, Lodging) | $ 1,253.07 |
| Keith Frederick, Esq. (Copy of Transcript) | $ 101.30 |
| Volkswagen Group of America, Inc. (parts purchase) | $ 120.66 |
| Expenses of Genova, Burns, & Vernoia (photocopying, telephone, travel) | $ 1,989.34 |
| Breakaway (Dart) Courier | $ 51.40 |
| Citistorage | $ 61.08 |
| **Total:** | **$376,033.78** [88] |

(*Dewey*, Docket Entry No. 196 Attach. 3; *Dewey*, Docket Entry No. 242 Attach. 2 at 2.)

While some of the expenses will be disallowed pursuant to the cases discussed herein or due to lack of sufficient explanation as to why they were incurred, Mr. Sporn's certification has detail that provides sufficient evidence to support the other expenses. Thus, based upon the above cited Rules, statutes, and case law, expenses for *pro hac vice* fees ($1,382), as well as travel, food, and lodging ($23,839.57) are all precluded. *Pretlow v. Cumberland Cnty. Bd. of Soc. Servs.*, Civ. No. 04–2885, 2005 WL 3500028, at *9 (D.N.J. Dec. 20, 2005) (denying request for reimbursement for *pro hac vice* fees and noting that "under normal circumstances, a party that hires counsel from outside the forum of the litigation *may not* be compensated for travel time, travel costs, or the costs of local counsel") (citing *Interfaith Cmty.*, 426 F.3d at 710 (stating that the plaintiff was not entitled to costs for outside counsel including train tickets from Virginia to New Jersey, lodging in New Jersey, rental cars, and meals)); *see also Apple Corps Ltd. v. Int'l Collectors Soc'y*, 25 F.Supp.2d

480, 499 (D.N.J.1998) (denying request for reimbursement for meals). In addition, plaintiff provided no basis to compensate Rimkus Consulting, a "nonretained expert," (*Dewey*, Docket Entry No. 224 ¶ 16), more than the $40.00 witness fee set forth in 28 U.S.C. § 1821. Therefore, the requested compensation of $2,400.00 will be reduced by $2,360.00.

As to the $41,079.80 in "Expert and Consulting Fees" for Edward Labaton, (*Dewey*, Docket Entry No. 242 Attach. 2), this expert submitted a certification, was deposed, and was mentioned at the Fairness Hearing as the individual involved in opining about the reasonableness of counsel's hourly rates. This expense is denied because it was not a basis upon which any relief was granted. Moreover, it was unnecessary given the volume of reported cases concerning reasonable rates in this District and available comparator's, including the Sporn's firm's local counsel and its New Jersey co-counsel. As a result, the Sporn firm's reimbursement request of $376,033.78 will be reduced by $23,839.57 for travel, food and lodging, $1,382 for *pro hac vice* fees, $2,360 for the work of Rimkus Consulting, $41,079.80 for the work of Edward Labaton, and for reasons discussed herein, $15,800.23 for the work Charles River Associates performed, resulting in a reimbursement award to Schoengold & Sporn, P.C. of $291,572.18.

As it relates to the $627,618.37 reimbursement for expenses that Mazie Slater seeks, Mr. Slater has presented his firm's printout of un-reimbursed expenses. These expenses are:

| | | |
|---|---|---|
| 1. | Attorney Travel/Disbursement/ Expenses | $ 3,549.89 |
| 2. | Searches | $ 122.56 |
| 3. | Subpoena Fees | $ 664.75 |
| 4. | Telephone Services | $ 1,477.57 |

---

**88.** Mr. Sporn's Certification calculated the value of all requested reimbursements to be $376,033.78. (*Dewey,* Docket Entry No. 196 Attach. 3; *Dewey,* Docket Entry No. 242 At-

tach. 2.) The Court added each individual expense and arrived at a value of $376,033.68.

| | | |
|---|---|---|
| 5. | Lawyer Service | $ 281.32 |
| 6. | Interpreter/Translations | $ 5,680.50 |
| 7. | Transcripts | $ 58,630.55 |
| 8. | Court Fees | $ 399.28 |
| 9. | Legal Research | $ 7,034.44 |
| 10. | Internal Copying Expenses | $ 17,044.39 |
| 11. | Outside Copying/Printing Expenses | $ 29,985.37 |
| 12. | Internet Investigation | $ 7,902.12 |
| 13. | Expert Fees | $483,189.33 |
| 14. | Federal Express | $ 4,330.75 |
| 15. | Messengers | $ 728.64 |
| 16. | Postage | $ 239.16 |
| 17. | Computer storage discs | $ 30.49 |
| 18. | Witness expenses | $ 250.00 |
| 19. | Bosch document production | $ 6,365.13 |
| 20. | Refunds | $ (287.87) |
| | **Total:** | **$627,618.37** |

(*Dewey*, Docket Entry No. 195 Attach. 1 at 13; Docket Entry No. 224 ¶ 18.)

As it relates to the $483,189.33 sought to compensate their experts, Mr. Slater provided a supplemental certification setting forth the following experts' names, areas of expected expert testimony, and expenses:

| Name | Subject | Cost of Services |
|---|---|---|
| Donald Phillips | Professional engineer who provided pre-complaint advice. | $2,500.00 |
| William E. Gest | Automotive engineer who was expected to testify at trial regarding design and engineering drawings. | $88,352.43 |
| Joseph Bradley | Warranty and customer service specialist expected to testify at trial about warranties and customer service campaigns. | $6,600.00 |
| Gerald Meyers | Automotive industry specialist expected to testify at trial about defendant's practices and potential remedies. | $17,163.75 |
| Robert C. Keller | Chemist expected to testify at trial about the chemical properties of certain components used in the drain valves. | $21,944.46 |
| Martin Potok | Product engineer expected to testify at trial about design flaws in the plenum and sunroof drain and provide alternate designs. | $13,707.33 |
| Mark Allen | Automotive technician expected to testify at trial about the cause of water ingress, damages, and Volkswagen's maintenance instructions. | $21,254.00 |
| Ian Hanson | Automotive technician expected to testify at trial about repair and maintenance procedures. | $2,000.00 |
| Kilbourne Company | Provided statistical analysis of customer complaint and warranty data for use of settlement valuation experts and an alternative method to calculate the value of the settlement. | $70,600.00 |
| Richard Hixenbaugh | Automotive appraiser hired to provide data regarding diminution of the value of water damaged vehicles. | $5,337.59 |
| George C. Eads | Economist hired to provide value of the settlement. | $233,729.77 |

(*Dewey*, Docket Entry No. 224 ¶¶ 4–14; *Dewey*, Docket Entry No. 240 at 4.)

Some of the experts are duplicative. For example, the plaintiffs had two automotive industry experts (Messrs. Bradley and Meyers) prepared to testify about warranty and customer service issues, for a total of $23,763.75. There is no way to distinguish their testimony to know how each was reasonably necessary to pursue the plaintiffs' claim. *See Baldi Bros. Con-* *structors*, 52 Fed.Cl. at 82. The same can be said of the two automotive technicians (Messrs. Allen and Hanson), both of whom would testify about repair and maintenance issues, for a total of $23,254. There is nothing to show that both were reasonably necessary for the plaintiffs to pursue their claims. *Id.; see also In re Paoli R.R. Yard PCB Litig.*, 221 F.3d at 463 n. 4 (discussing cases disallowing costs for unnecessary witnesses or otherwise en-

cumbering the record) (citations and quotation omitted). Thus, the Court will award one-half of the expenses associated with Messrs. Bradley, Meyers, Allen, and Hanson, totaling $23,508.88.

The plaintiffs also seek compensation totaling $309,667.36 for the reports and settlement valuation opinions from Kilbourne Company,[89] George Eads and Charles Rivers Associates, and Richard Hixenbaugh. The Court declines to order defendants to pay full reimbursement for these expenses. First, for the reasons already discussed, the expert's valuation opinion was significantly inflated and his proposed valuation was reduced by approximately 50%. Moreover, the parties' last minute agreed upon valuation of $90 million was reduced by approximately 20%. Furthermore, the plaintiffs declined to ask the Court to consider diminution of value during the Fairness Hearing. The Court rejected two-thirds of the categories upon which the value was based, as well as the unfounded assumption that 100% of the class would seek out the benefits. As a result, the Court accepted only one-third of the grounds on which the plaintiffs relied. The Court cannot ignore this partial success and, relying on the principles in *Hensley v. Eckerhart*, 461 U.S. 424, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), will reduce the amount sought by two-thirds. *See Dalles Irrigation Dist. v. United States*, 91 Fed.Cl. 689, 709 (Fed.Cl.2010) (applying a three-sevenths proportion to an expert fee award because of the plaintiffs' partial success in proving their claim).

Second, and as significantly, the major purpose for these experts was to justify the use of the percentage-of-recovery method to calculate the attorneys' fees. Unlike the other experts, who provided information to pursue the merits of the claims and thereby advance the interests of the class, these experts really only advanced the interests of the lawyers. Although Dr. Eads's opinion, for example, confirmed that the settlement had value and that there is a reasonable basis to provide different benefits to different class members, the other technical experts that the plaintiffs had engaged for trial would have been able to provide similar helpful information. As this expensive opinion was not reasonably necessary for the plaintiffs to pursue their claims, the Court declines to provide the full relief sought. Thus, the Court will award only one-third of the reimbursement sought for the expenses associated with the Kilbourne Company, Charles River Associates and Dr. Eads, and Mr. Hixenbaugh and will order reimbursement totaling $103,222.45 for the work of these experts and will disallow $206,444.91 for expenses associated with their services.

In addition, the reimbursement requests of $3,549.89 for what is labeled as "attorney travel/disbursement/expenses," $122.56 for what is labeled as "searches," $7,902.12 for what is labeled as "internet investigation," and $250 for what is labeled as "witness expenses" will be denied for lack of specific information to show that the expenses are reasonable or how they furthered the plaintiffs' pursuit of their claims. The remaining expenses are typical, recognized as compensable, and adequately documented. Therefore, Mazie Slater will be awarded reimbursement in the amount of $385,840.01.

---

**89.** Although the Court would not have provided any compensation for experts who provided alternate valuations that were not presented, the Court declined to strike all of the costs sought for the work Kilbourne Company performed because they apparently played a significant role in compiling all of the data. (*Dewey*, Docket Entry No. 224 ¶ 12.) Their work was apparently shared with Dr. Eads and the defendants and reduced compilation expenses that they both would have borne.

## IV. *CONCLUSION*

For the reasons stated herein, the motion final approval of the settlement class and class settlement is granted, the amount of $9,207,248.19 shall be awarded as fees to class counsel, and reimbursement for expenses is granted in the amount of $385,962.57 for Mazie Slater Katz and Freeman, LLC and in the amount of $291,572.18 for Schoengold &

Sporn, P.C. and $10,000 shall be awarded to each of the following class representatives: Kenneth Bayer, Jacqueline Delguercio, Patrick DeMartino, John M. Dewey, Lynda Gallo, Edward O. Griffin, Ronald Marans, Francis Nowicki, and Patricia Romeo.

A judgment consistent with this Opinion will be issued.

| | | | **APPENDIX A** | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| CPI for April 2009 | 213.240 | Source: ftp://ftp.bls.gov/pub/special.requests/cpi/cpiai.txt | | | | |
| CPI for June 2010 | 217.965 | | | | | |
| Percentage Increase | 2.216% | | | | | |
| | | | | | | |
| | Position / Graduation Year | Dewey Hourly Rates | Drazin Rates (comparable atty's or Dewey rates used when Drazin Rates not available) | Drazin Rates (CPI-Adjusted) (not applied to retained Dewey rates) | Dewey Hours | Lodestar |
| David Mazie | Partner (1986) | $795.00 | $560.00 | $572.41 | 88.5 | $ 50,658.16 |
| Adam Slater | Partner (1993) | $695.00 | $460.00 | $470.19 | 1823.3 | $ 857,302.42 |
| Eric Katz | Partner (1991) | $650.00 | $460.00 | $470.19 | 156.6 | $ 73,632.18 |
| David Freeman | Partner (1988) | $650.00 | $460.00 | $470.19 | 750 | $ 352,644.56 |
| Jennifer Pawlak | Associate (1994) | $460.00 | $260.00 | $265.76 | 125.8 | $ 33,432.75 |
| Matthew Mendelsohn | Associate (2005) | $425.00 | $215.00 | $219.76 | 1602.9 | $ 352,259.71 |
| Karen Kelsen | Associate (2008) | $275.00 | *$215.00* | *$219.76* | 1292.9 | $ 284,127.70 |
| Irina Elgart | Associate (1999) | $275.00 | $268.00 | $273.94 | 11.2 | $ 3,068.11 |
| Steven Sederens | Contract Assoc. (N/A) | $150.00 | *$150.00* | *$150.00* | 77 | $ 11,550.00 |
| Cheryll Calderon | Associate (2006) | $225.00 | *$215.00* | *$219.76* | 105.1 | $ 23,096.78 |
| John Gagnon | Associate (2007) | $325.00 | *$215.00* | *$219.76* | 3.5 | $ 769.16 |
| | | | | | 6036.8 | $ 2,042,541.53 |
| | | | | | | |
| | | | | | | |
| | Position / Graduation Year | Dewey Hourly Rates | | Drazin Rates (CPI-Adjusted) | Hours | Lodestar |
| Samuel P. Sporn | Partner (1953) | $790.00 | | $572.41 | 1334.8 | $ 764,052.87 |
| Joel P. Laitman | Partner (1986) | $650.00 | | $470.19 | 27 | $ 12,695.13 |
| Christopher Lometti | Partner (1986) | $650.00 | | $470.19 | 60.25 | $ 28,328.95 |
| Kurt Hunciker | Of Counsel (1978) | $650.00 | | $470.19 | 2.5 | $ 1,175.48 |
| Jay P. Saltzman | Of Counsel (1994) | $600.00 | | $470.19 | 2683.02 | $ 1,261,529.17 |
| Ashley Kim | Associate (1999) | $475.00 | | $265.76 | 669.08 | $ 177,814.70 |
| Frank Schirripa | Associate (2002) | $450.00 | | $265.76 | 420.05 | $ 111,632.49 |
| Daniel B. Rehns | Associate (2005) | $325.00 | | $219.76 | 162.5 | $ 35,711.00 |
| Pietro deVolpi | Associate (2008) | $250.00 | | $219.76 | 638.5 | $ 140,316.76 |
| Irena Shpigel | Attorney (N/A) | $215.00 | | $219.76 | 16 | $ 3,516.16 |
| Tom Santanello | Attorney (N/A) | $215.00 | | $219.76 | 72 | $ 15,822.72 |
| Marta Michael | Law Clerk (N/A) | $185.00 | | $150.00 | 53.5 | $ 8,025.00 |
| Nancy Ahern | Law Clerk (N/A) | $185.00 | | $150.00 | 19.5 | $ 2,925.00 |
| | | | | | 6158.7 | $ 2,563,545.42 |
| | | | | | | |
| Total Lodestar | | | | | | $ 4,606,086.95 |